

# Overview of the Colorado Method of Capital Voir Dire

The Colorado Method of capital voir dire is a structured approach to capital jury selection that is being used successfully in state and federal jurisdictions across the United States. Colorado Method capital voir dire follows several simple principles: (1) jurors are selected based on their life and death views only; (2) pro-death jurors (jurors who will vote for a death sentence) are removed utilizing cause challenges, and attempts are made to retain potential life-giving jurors; (3) pro-death jurors are questioned about their ability to respect the decisions of the other jurors, and potential life-giving jurors are questioned about their ability to bring a life result out of the jury room; and (4) peremptory challenges are prioritized based on the prospective jurors' views on punishment.

The capital defense community traditionally has done a remarkably poor job in voir dire and jury selection. Research conducted by the Capital Jury Project — based upon interviews of more than 1,200 jurors who actually made the life or death sentencing decisions in 350 capital trials in 14 death penalty states — established that: (1) many pro-death jurors who are constitutionally impaired and subject to defense cause challenges nonetheless have served on capital juries and, furthermore, (2) a large portion of the jurors who do serve fundamentally misunderstand and misapply the constitutional principles that govern the sentencing decision-making process. These misunderstandings significantly increase the likelihood jurors will vote for death.[1] The Colorado Method of capital voir dire, which was developed independently of the Capital Jury Project research and findings, provides defense counsel with the skills and techniques to address many of the shortcomings identified by the Capital Jury Project and to conduct capital voir dire in a manner that maximizes the opportunity to obtain life verdicts.

The Colorado Method of capital voir dire works to create a nonjudgmental respectful atmosphere during jury selection that facilitates juror candor and allows defense counsel to then learn the prospective jurors' views about punishment for a person guilty of capital murder and eligible for imposition of a death sentence. Jurors are rated on a scale of 1 to 7:

1. *Witt* Excludable (WE). The person who will never vote for the death penalty and is vocal, adamant, and articulate about it.

2. A person who is hesitant to say that he believes in the death penalty. This person obviously realizes the seriousness of being asked to sit on the capital jury and takes seriously the value of human life. However, this person says she can give meaningful consideration to the death penalty. These people need to understand the power and responsibility each juror has to make the life

BY **MATTHEW RUBENSTEIN**   Exhibit B

or death decision for himself or herself (and each juror has the power to ensure a life sentence result) and that each juror's individual, personal moral judgment is to be respected. They must understand how to bring a life result out of the jury room. Individuals in the 2 category can be intelligent abstract thinkers or less intelligent, but compassionate, people.

3. Basically pro-death penalty. Able to quickly say, "I'm for the death penalty, and have been for quite a while." They are, however, unable to express why, in fact, they are for the death penalty. The impression one gets from them is that they are pro-death as long as someone else is responsible for imposing the sentence. We call this a "kill problem." Individuals in group 3 do not necessarily propose the economic argument or the deterrence argument for death. They are more sensitive to mitigation and really wish to hear mitigation. Unlike people in categories 5, 6, and 7, they may be able to make an argument against the death penalty if asked and are also readily willing to respect the views and individual assessments of those who are more hesitant about the death penalty.

4. Pro-death. Comfortable and secure in the death penalty. People in group 4 can tell you why they are for the death penalty and feel it is a "good thing." However, they wish to hear "both sides." Members of group 4 are more fence-straddling in voir dire when it comes to the penalty phase evidence. They readily argue that there could be mitigation that calls for life even after conviction of first-degree, cold-blooded, after-deliberation murder. They are different from group 3 members in their initial response of having a comfort level with the death penalty and the development of arguments in favor of it.

5. Pro-death, vocal, articulate in their support for the death penalty; less sensitive to mitigation than a category 4 person, but more than a 6. A person in category 5 is a sure vote for death, but this person can formulate perhaps two or three mitigating factors she might think are significant. An individual in category 5 would allow a unanimous vote for life but would vote for death on the first ballot and remain with the majority. A group 5 member is more sensitive to the rights of other jurors in their assessments of mitigation and would be less prone to being a bully than a group 6 or a group 7 member. A 5 is also more susceptible to residual doubt than a 6 or 7. Likes the prosecutor.

6. A strong pro-death juror. Escapes ADP (automatic death penalty) challenge because she can listen to a "perhaps" mitigation scenario and the judge saves her. Concrete backer of death penalty. Only argument against the death penalty is that it is not used enough. Believes in the deterrence argument and believes that the economic burden of a life sentence for defendant and others will personally affect her. Head-nodder with the prosecutor.

7. ADP. If your client is convicted of capital murder, these jurors will impose the death penalty. They believe in "an eye for an eye." Life imprisonment is not an adequate sentence, in their opinion. Mitigation to them is manslaughter or self-defense. Hateful and proud of it. They must be removed, preferably, for cause, but at least with a peremptory.

A person in group 1 is a conscientious objector and is impaired because she will never give meaningful consideration to a death sentence. A group 7 member is an ADP juror and is impaired because she will not give meaningful consideration to life imprisonment without release. During voir dire attorneys then build a record of the juror's verbal responses and written responses to the juror questionnaire to support a "cause" challenge against pro-death jurors and to defend against a government "cause" challenge against potential life-givers. Jury research tells us that in many instances pro-death jurors employ coercive tactics and bullying against jurors favoring life during sentencing deliberations in an effort to force these jurors to give up their principled sentencing decision that had been arrived at after faithfully and conscientiously following the law. To address this, capital defense attorneys question the prospective pro-death jurors who may end up on the jury about their ability to respect the views of the other (potential life-giving) jurors and question potential life-giving jurors about their ability to bring a life verdict out of the jury room. The attorney should confirm that the prospective jurors understand and are willing to be guided by the constitutional principles that govern the juror sentencing decision-making process.

The "Wymore Hanger" in Figure 1 is a useful schematic of the Colorado Method of capital voir dire.

A benefit of applying a systematic approach to the voir dire process is that it identifies the goals of each step of the process and facilitates clear team communication and collaboration.

**Figure 1**



THE COLORADO METHOD

### Every Juror Has Right to Be Treated With Respect And With Dignity

It is advantageous to clearly communicate to the prospective jurors early in the process that they have the right to be treated with respect and with dignity throughout the voir dire and trial process. This message helps to create an atmosphere that facilitates candor and honesty and, ultimately, will help the jurors understand and exercise the tremendous individual, personal moral responsibility they will be given at the end of a sentencing hearing to decide whether another human being — the client — lives or dies.[2]

In order to maximize juror candor, attorneys should discourage the court from using language that suggests the voir dire process is designed to identify jurors who can be "fair" or "appropriate" for the case and avoid language that conveys the message that the jurors are being judged, "interviewed," or otherwise evaluated. This language encourages jurors to provide what they view as socially acceptable rather than candid responses. It is better if the court simply uses language suggesting that there are no "right" or "wrong" answers and the court and parties are interested in learning the jurors' feelings and views on a variety of issues. The instruction could include the following language: "Before we begin, I would like to explain that there are no 'right' or 'wrong' answers to any of the questions that will be posed to you today. Citizens in our community have and are entitled to hold different views and perspectives on many topics, and the same holds true for jurors. You will all be treated with dignity and respect, and I simply ask you to provide honest and complete answers."

### Discussion of Indictment, Emotionally Difficult Nature of the Evidence, And Allegations

Before asking questions about a juror's views on the death penalty and life imprisonment without the possibility of release, it is helpful to use a poster summarizing the charges in the indictment. This will give defense counsel an opportunity to inquire about the juror's knowledge of the case and his or her ability to sit as a juror in a case in which graphic evidence will be presented about a violent event and a homicide victim. A small but not insignificant number of prospective jurors ask for a hardship excusal when they are asked about their ability to listen to and evaluate this type of evidence. Furthermore, this line of questioning is effective in bringing the enormity and gravity of the criminal conduct alleged in the case front and center. If we discuss the violent nature of the charges before we ask jurors to share their feelings and views about the death penalty, we are more likely to get emotionally honest views and feelings and a more realistic assessment of the jurors' ability to give meaningful consideration to all sentencing options.

### Cart Before the Horse

Research shows that jurors who are questioned about their punishment views before a trial even begins are more likely to convict the defendant and to sentence the defendant to death.[3] Defense counsel must ask the court to include language in an instruction given to prospective jurors prior to voir dire that addresses this "processing effect."

> I want to advise you in the strongest possible terms that the fact that I (and the attorneys) question you about your feelings and opinions about punishment now certainly does not mean that Mr. Defendant is guilty of any crime. Mr. Defendant is presumed by law to be innocent. This questioning does not mean that I think Mr. Defendant is guilty, or that the attorneys or I expect him to be convicted. This questioning is required by law in every trial in which the government is seeking the imposition of a death sentence. We will ask you about your feelings and views concerning the possible sentences of life imprisonment without the possibility of release and the death penalty before the trial even starts, not because I think this case will proceed to a sentencing trial, but because we must ask questions of prospective jurors at the beginning of a case about all possible events no matter how remote they may be. This is the only opportunity we have to ask jurors questions. You are not to draw any conclusions about the case or the evidence from the fact that we are asking you about punishment before there has even been a trial to determine whether the defendant is "guilty" or "not guilty."

When defense attorneys prepare to shift the questioning to the juror's views about the death penalty and life imprisonment without the possibility of release, they should reiterate that, in asking the juror these questions, they do not want the juror to believe that they expect or anticipate that the client will be convicted and that a sentencing trial will occur.

Defense counsel should tailor this "cart before the horse" introduction to the strength and focus of the defense. They need to maintain credibility with the jurors, and they do not want to make absurd, strident, overly confident proclamations in a case in which the jurors will believe the defense was weak. Nevertheless, even when defense attorneys expect the jury will return a guilty verdict, it is useful to frame the culpability case in some manner that permits them to argue for an acquittal or conviction on lesser noncapital charges. Although most capital cases remain penalty phase cases, presenting a reasoned and vigorous defense theory at the guilt-innocence phase is useful because it permits jurors to express (and relieve) their anger at the defendant prior to the start of the penalty phase, and it can empower life-prone jurors to extract concessions from other jurors regarding a sentencing phase life verdict in exchange for a guilty vote in the first phase. Ideally, the culpability trial defense theory also lays the foundation for the theory for life. The mitigating evidence "front-loaded" in the culpability trial helps pave the way for an effective and persuasive presentation of mitigation in the sentencing trial.

### First Step: Learning Prospective Jurors' Views About Life and Death

Defense attorneys use leading questions to strip away extraneous defenses or irrelevant facts in order to gather meaningful, relevant answers and information from the prospective juror regarding her views of the death penalty and life imprisonment. The lawyer puts the prospective juror in the place of having been personally convinced that a hypothetical defendant is guilty of capital murder. The "strip question" normally incorporates relevant case-specific facts in a manner that avoids "staking out" and "precommitment."[4] Defense counsel says to the prospective juror, "I would like you to imagine a hypothetical case. Not this case. In this hypothetical case, you heard the evidence and were convinced the defendant was guilty of premeditated, intentional murder. Meant to do it and did it. It wasn't an acci-

dent, self-defense, defense of another, heat of passion, or insanity. He meant to do it, premeditated it, and then did it. For that defendant, do you believe that the death penalty is the only appropriate penalty?" (If, for example, the case involved one prisoner serving a life sentence who killed a correctional officer, the question would include this fact: "In this hypothetical case, you heard the evidence and were convinced that the defendant, who was a prisoner serving a life sentence, intentionally killed a correctional officer.")

Based upon the preliminary rating derived from the juror questionnaire, the defense team may know it wants to develop a cause challenge to a pro-death prospective juror. In this scenario, the defense avoids open-ended questions and moves down the "Wymore Hanger" to use leading questions to develop multiple legal impairments that will support the cause challenge (or protect a potential life-giving juror from a government cause challenge).

In many instances the defense does not know the juror's views, or the defense needs additional information to be confident about rating the juror, so counsel asks open-ended questions to elicit these views. The lawyer should adopt a conversational and nonjudgmental tone to elicit views about the death penalty, the types of cases the prospective juror believes deserve the penalty of death, arguments or policy reasons the juror finds compelling for or against capital punishment, the length of time the juror has held these views, and the basis for these views (upbringing, religious conviction, personal moral code, concerns about appropriate use of government resources, etc.).

How does the juror feel about life imprisonment without the possibility of release (LWOR) for a guilty killer? Is this a serious penalty for a guilty killer? (If the case involves eight homicides: "Is this a serious penalty for a guilty killer of eight innocent victims?") Why? "Do you think mercy is something that a person earns, or is it something that one bestows on another?" "Could you consider being merciful to someone you believe had killed without justification or excuse?" In a case in which the defendant has conveyed to others his absolute innocence, ask: "Could you consider being merciful to someone who continues to defend his actions and say they were justified?" "For you, if someone has committed a violent crime, what information do you think would be important to learn if you were going to pass judgment on the person?" "For you, is the death penalty an appropriate punishment for [the category of case here, e.g., a case involving the killing of a correctional officer by an inmate], or is it reserved as a very last resort?" "Do you believe that being merciful and sparing a defendant's life — and punishing him with life imprisonment without the possibility of release — is ensuring a severe punishment and not forgiving or excusing his crime?"

Request a week or more to evaluate and analyze the juror questionnaires prior to individual sequestered voir dire. This comprehensive analysis of the questionnaires will ultimately save court time because it increases the likelihood the parties can agree on the excusal of "extreme" jurors who are impaired (thereby increasing the percentage of qualified jurors in the pool of jurors who will be examined) and gives the parties time to prepare tailored and targeted questioning of the jurors. A day or two before prospective jurors are questioned, the team should discuss each prospective juror's questionnaire, develop a preliminary rating, and highlight relevant information for the voir dire. The team members will then modify their rating again based upon the juror's response to the court, government, and defense questioning. The decision about whether the defense team has enough information to rate the juror, and the rating itself, is best made collaboratively by the entire team. (In an ideal situation, the in-court team during voir dire consists of two attorneys, a jury consultant, and an assistant, paralegal, or law student.)

Prior to and during voir dire, the team must decide when to shift from the information-gathering stage (open-ended questioning designed to identify and rate the prospective juror) to the record-building stage (closed-ended leading questioning designed to obtain information to prepare to assert or defend a cause challenge). Members of the defense team must weigh the potential advantages of gaining additional information utilizing open-ended questions (to confirm the rating or learn more about the juror to help the team tailor its later trial presentation) against the potential risks that the additional information gathered will interfere with the ultimate goal of removing or keeping the juror. In addition, the team must be thoughtful about the manner in which information elicited from jurors may be exploited by the government in the use of peremptory challenges. For example, if a juror has stated on the juror questionnaire that she believes the death penalty should be imposed upon any defendant who intentionally kills (a prospective juror rated a 6 or 7), in most instances defense counsel should move directly into the record-building stage and use leading questions designed to prepare a cause challenge. If the defense attorney asks this juror open-ended questions about her views on the death penalty, the attorney invites the risk that the juror will make statements that qualify her or insulate her from a cause challenge. For example, rather than asking, "Are there any types of mitigation evidence you would consider in making your decision?" we should frame a leading question, "You want to focus on what the person did and the punishment must fit the crime. Evidence that he suffered abuse as a child is not relevant to you — it is not something you are going to consider — is it?"

The same issues arise with open- and closed-ended questions for a potential life-giving juror. Open-ended questions designed to elicit the juror's views on punishment invite the juror to make a statement that may support the government's effort to remove the juror for cause. We should avoid this risk and use leading questions to get the juror to commit to considering all sentencing options, keeping an open mind and waiting until all of the evidence is presented before the juror will decide or make any commitment about how she may vote.



THE COLORADO METHOD

THE COLORADO METHOD

For prospective jurors preliminarily rated in the middle (category 3, 4, or perhaps 5) or from whom the defense needs to obtain additional information, defense counsel questioning the juror should consult with her team during the voir dire process. In particular, defense counsel should inquire about two key decisions. First, the defense should discuss the rating of the juror. The rating developed by the team is more accurate than that of one counsel, and this rating then informs the ultimate goal of the voir dire — removal or retention of the juror. Second, defense counsel should discuss the timeframe for moving forward from the information-gathering phase utilizing open-ended questions to the record-building phase utilizing leading questions. In some instances, after the team has decided to move forward to the record-building phase, a juror makes a statement that calls into question the initial rating of the juror. The questioning of the juror then moves back into the information-gathering phase or jumps over to record-building to prepare to defend a cause challenge. For example, a juror initially rated a "6" may clarify that if the victim of the murder is not a child, the juror would be very reluctant to impose a death sentence. If the victim in the case is an adult, this clarification would cause the defense team to reassess its voir dire plan for this juror. The defense might revise its rating of the juror to a "3" on this and additional information gathered and then work to protect this juror from a government cause challenge.

### Re-Stripping the Prospective Juror

Often during the voir dire process, the defense needs to "re-strip" a prospective juror, particularly a death-leaning juror. When a prospective juror qualifies an opinion about the propriety of a particular punishment with language such as "it depends on the circumstances" or otherwise indicates that she may be answering questions about her views on punishment in the context of a factual scenario less than capital murder, we must stop and "re-strip." For example, for a juror rated "6," we might have the following exchange.

Q: Based on your firmly held beliefs, as I understand them, a person who intentionally kills another deserves the death penalty; it is the only appropriate penalty. Correct?

A: Well, not in every case. I mean, if it is an accidental killing, I could give life.

Q: That is a great point. Thank you for sharing that. If a defendant did an accidental killing, it would be a defense to capital murder, and we wouldn't have a capital sentencing hearing. I want you to assume you were a juror, you heard the evidence, and you were convinced the defendant killed an innocent victim. No accident. Did it and meant to do it. For that defendant — for that guilty killer — the only appropriate penalty is death, correct?

A: Yes.

### Record Building: Questioning to Challenge

Capital defense lawyers use leading questions with the goal of building a record that establishes the juror is impaired under the standard of *Wainwright v. Witt*.[5] They seek to establish that the juror believes that the death penalty is the only appropriate punishment ("case-specific penalty bias"), cannot give meaningful consideration to life imprisonment without release, cannot give meaningful consideration and effect to mitigating circumstances ("case-relevant mitigating evidence bias"),[6] will "burden shift" on the life or death issue and vote for death unless presented with compelling evidence to do otherwise by the defense,[7] and will impose a death sentence based on an illegal basis (such as a concern about the cost of incarcerating an offender for life).

The defense seeks to develop multiple impairments to support the challenge for cause; however, the defense attorney must consider the strategic implications of seeking to develop additional impairments if the attorney believes the effort may ultimately detract from the argument that the juror is impaired. For example, if a prospective juror has made statements suggesting that the juror believes that a death sentence is the only appropriate sentence for a defendant who has committed the category of case charged in the case (e.g., a kidnapping-murder, murder of two people, or murder in prison, etc.), but the juror has made statements that lead the defense to believe the juror may indicate that he is interested in hearing about a defendant's background, the defense avoids unnecessary risk and skips questioning designed to develop a "mitigation impairment."

Moreover, defense counsel should use case-specific and case-category questioning that avoids "staking-out" or "pre-committing" a juror here.[8] Cases out of the Northern District of Iowa and Vermont provide useful guidance for questioning. "[T]he court ... finds that it would be permissible for defense counsel to frame a 'case-specific' question as a 'life-qualifying' question ... [and] also ask 'case-specific' variants of the question approved in *Morgan*, such as the following: 'If you found the defendant guilty *of murdering children*, would you automatically vote to impose the death penalty, no matter what the other facts are?'"[9] Review the Iowa case *United States v. Johnson* for a useful discussion distinguishing appropriate case-specific and case-category questioning from inappropriate "stake-out" or "pre-commitment" questions.

When the defense attorney "strips" and then question pro-death jurors, the attorney wants to avoid talking directly about the client's own case because doing so conditions the juror to vote for death in the client's case. Rather, the attorney should continue to indicate that she is talking about a hypothetical case (albeit similar to the client's case), and use leading questions to attempt to obtain responses to support her cause challenge. Normally, the defense attorney strives to create a relaxed, comfortable, and open atmosphere during voir dire to facilitate candor, model mutually respectful communication and behavior, and build the jurors' sense of empowerment. However, in some instances, aggressive questioning of a pro-death juror is useful and necessary to provoke the juror to disclose her honest feelings. "If you were sitting as a juror in a different case, you heard the evidence and were convinced the defendant was guilty of [category of case being tried; e.g., rape-murder, killing in prison, murder-for-hire, killing multiple victims, etc.], is it fair to say that, for you, the only appropriate penalty would be a death sentence?" Or, "If you were convinced that the defendant had previous violent felony convictions, including first-degree murder, and that he had intentionally killed again, based on your value system, the penalty should be a death sentence, right? You feel pretty strongly about that, don't you?" "For you, a life sentence is not something you would consider if the evidence showed x?"[10]

"Where 'the source of [a juror's] bias [i]s not the death penalty in the abstract, or in some irrelevant hypothetical case,' but the juror's inability 'to overcome his bias and vote in favor of ... [a life sentence] where [some specific facts are shown],' this court is 'not required to ignore this bias.'"[11]

### Record Building: Questioning to Defend Against Government Challenge

Here again, use leading questions with the goal of building a record that establishes the juror is not impaired under the standard of *Witt*. Begin by validating the juror's feelings and thanking her for expressing her candid views. Emphasize that no one is going to force the juror to change her mind and that she is not being judged. Convey that everyone respects and values the juror's reservations about or opposition to capital punishment and empathizes with her. Then use leading questions to transition the questioning to explain that the defense is going to want something different from the juror than her anti-death penalty feelings.

"Did you know that a person may hold very strong feelings that capital punishment is misguided or wrong — based on personal, moral, philosophical or whatever reasons — and the person can serve as a juror on a capital case?" Then explain what the law requires. Many people have personal, moral, or philosophical opposition to the death penalty yet serve on a capital jury; people can only be excluded if they cannot follow the law. Explain that the law cannot ask them to make a decision now; they have not heard any of the evidence. The law requires that they agree, if the case ever reaches a sentencing trial, to give meaningful consideration to all sentencing options.

The next step is to provide an overview of the trial process. Confirm that the juror is confident she can listen to the evidence in the culpability trial and decide whether the government proved or failed to prove guilt. Explain that if the result is "not guilty," the case is over. Then explain that the juror decision-making in a sentencing trial — if it ever occurs — is different than in the first "guilty / not guilty" trial in that the jurors evaluate the mitigation individually and the ultimate life or death decision is made by each juror individually. Each juror is called upon to make a unique, individual judgment about the sentence the defendant will receive and there is no legal or other requirement that these decisions must be or even should be unanimous. A sentencing decision that is not unanimous is lawful, legitimate, and appropriate.[12] Confirm that the juror can be fair at the culpability trial. Explain that the case may never proceed to a sentencing trial.

Next, explain the process of a sentencing trial in the event the defendant is found guilty of capital murder. Explain that the jurors evaluate the gateway intent issue and then statutory aggravating circumstances and that if either of these is not found proven beyond a reasonable doubt by all 12 jurors, then the process stops, and there is no consideration of a death sentence. Explain that *only if* these things are found to have been proven will the jurors then consider nonstatutory aggravating circumstances and then mitigation. Explain that mitigation is any reason that supports, for any individual juror, a sentence of life imprisonment rather than death. In addition, tell the juror that in the federal system a juror considers any and all mitigation the juror believes has been established by a preponderance ("more likely than not") of the evidence.

Point out that the law is always satisfied with a life penalty; a juror is never required to impose a death sentence. ("Do you understand that the law never requires a juror vote for a death sentence — in this case, in any case, in the worst case you can imagine?") Many jurors do not know this, and many jurors with reservations about capital punishment express appreciation and relief upon learning this. Explain that the process requires the jurors to then consider whether the aggravating circumstances outweigh the mitigating circumstances. Each juror assigns the weight and significance he or she believes is appropriate to the aggravation and the mitigation. A juror has the lawful authority to assign the "weight of life" to any one mitigating circumstance if he or she wants to do this. Confirm that the juror understands that one vote for life imprisonment means that the death penalty will not be imposed.

Explain that the law never provides the answer on the ultimate issue; each juror makes a personal moral decision. Confirm that the juror understands that each juror will always be able to give life. One mitigating fact can outweigh all of the aggravating circumstances. It is always up to each individual juror. Confirm that the juror understands that a juror may choose life even if there are many aggravating circumstances and no mitigating circumstances. Make sure the juror understands that this would be a valid, appropriate, and lawful result.

The defense attorney should let the juror know that the attorney would like her to serve, because the juror does not necessarily know this. "We would like you to serve on this jury, and in order to do that, you have to be able to follow the law and the judge's instructions and not let your feelings get in the way of doing your job as a juror. Can you do that for us?"

### Principle Confirmation Phase

#### Teaching Pro-Death Jurors Respect and Potential Life-Givers How to Leave Jury Room With Life Verdict

When using leading questions to build the record to challenge a pro-death juror or save a potential life-giving juror from challenge, the attorney questioning the juror should consult with the defense team about whether the attorney should ask additional questions to continue building the record or accept the record and move forward to the final "Principle Confirmation" phase. In making this decision, the team must again consider the juror's existing responses, the potential benefit of gathering additional information from the juror to support the effort to remove or save the potential juror, and the risk that asking additional questions of the juror will risk inviting the juror to make statements counterproductive to the goal.

There are two common phenomena that arise in voir dire that the team approach helps to combat. First, the attorney conducting the questioning of a prospective juror frequently misperceives the strengths and weaknesses of the juror and her responses. Second, the attorney conducting the questioning frequently



WWW.PAECIVPOL.COM

PAE

wants to end the questioning of a pro-death juror prematurely because the questioning can become somewhat confrontational and because the attorney is subjected to the court's pressure to move things along. When the defense team is working collaboratively, the other members of the team can provide support to the attorney conducting the voir dire to help her avoid these pitfalls. After the record is made supporting the cause challenge on pro-death jurors, defense attorneys need to teach these jurors respect because some of them will survive the cause challenge and make it onto the jury. Finally, potential life-giving jurors need to be taught how to bring a life result out of the jury room. The defense accomplishes these tasks in the third and final "Principle Confirmation" questioning phase.

### 'Insulation,' 'Isolation' Applied — With Different Emphasis — To Pro-Death and Potential Life-Giving Jurors

In this "Principle Confirmation" phase, the defense again relies on leading questions to confirm that the jurors understand and are willing to make their sentencing trial decisions in a constitutionally appropriate and lawful manner. The data from the Capital Jury Project indicates that many jurors who have served on capital cases incorrectly believe that they did not have ultimate responsibility for determining the sentence in a capital case. Interviews with jurors also have established that many pro-death jurors employ coercive and bullying tactics to intimidate potential life-giving jurors to give up principled and lawful positions supporting the imposition of a sentence less than death.[13] Defense counsel must obtain a commitment from each pro-death juror that he or she will treat every other juror in a respectful manner and will not permit intimidation or bullying.

The goal in this "Principle Confirmation" questioning phase is to ensure each juror understands three related concepts that apply to the life or death decision-making process. David Wymore labeled these concepts isolation, insulation, and respect.

*Isolation* involves the defense attorney making certain that jurors understand the life or death decision that each juror makes in a capital case is an individual, *personal moral judgment.* This judgment is based upon each juror's personal philosophy, walk in life, and common sense. Neither the court nor the legal instructions will provide the answer to this ultimate question, and the law never requires a death sentence.

*Insulation* requires that defense counsel ensure that each juror understands that she makes her decision with the knowledge and comfort that it will be respected, she will not be bullied or intimidated by other jurors during her decision-making process, and the court and parties will respect her decision. Also, counsel makes clear that the juror should not permit any other jurors to be disrespected in this manner.

*Respect* entails defense counsel ensuring and extracting a commitment from every juror that she will respect the personal moral judgment made by every other juror on the ultimate life or death decision — whether she personally agrees with the other juror's decision or not.

### Exploring Unique Aspects of Decision-Making Process in Sentencing Trial (If There Is One)

One effective way of asking questions to confirm that a prospective juror understands the constitutional principles that guide the sentencing decision-making and will comply with these principles is to focus on two significant differences between the decision-making involved in the culpability trial and a sentencing trial: (1) factual determination v. moral decision, and (2) group decision v. individual, personal judgment. This questioning can be facilitated by using posters (see Figure 2) or computer-generated slides of a schematic of the sentencing trial decision-making process and a sample sentencing trial verdict form.

**Figure 2**
**Sample Voir Dire Poster: Schematic of Federal Sentencing Trial Decision-Making Process**



### Factual Determination v. Moral Decision

This portion of voir dire may proceed as follows.

Q: In the "guilty / not guilty" trial, the decision the jurors make is a factual determination. Was the light green or was it red? Was the shell casing from a .22 or a .38? The jurors are working together to determine what happened. They may disagree about these facts. One juror says she is right and that the other juror is wrong. But then they discuss and debate the evidence to figure out who is right and to arrive at a factual determination that is agreed upon by all the jurors. Are you confident you can participate in this type of deliberation process?

A: Yes, I can do that.

Q: You may have seen the movie *12 Angry Men*, a 1957 movie with Henry Fonda and Jack Klugman, among others, that portrays the process of sifting through the evidence to arrive at these factual determinations. The jurors may look at the physical evidence, or a photograph that has been introduced in evidence, or ask to have read back to them the testimony of a witness, and use this to determine the objective facts, the objective truth. Are you familiar with this process? Are you confident you can make these types of factual determinations?

A: Sure, I can do that.

Q: The decision the jurors make in a capital sentencing trial, if we get there, is very different from a normal trial or the decision made in *12 Angry Men*. Now, rather than a factual determination, the decision is ultimately an individual, personal moral decision each juror makes. The evaluation of mitigating factors is an individual decision each juror makes, and each juror then assigns the weight she believes is appropriate to the mitigating and aggravating factors and weighs them. The law does not provide the ultimate answer on the life or death decision; each juror decides this for himself or herself. This personal moral decision between life and death is made based upon each juror's unique life experience, personal philosophy, and personal judgment. Do you understand this? Knowing this, can you make this decision based on your personal moral judgment?

A: I think so, but it is a tremendous responsibility. I'd rather not have to make this decision.

Q: This individual personal moral judgment a juror is called upon to make is similar to the decision a person makes about important personal matters such as one's religious faith or whether or not to have children. These are intensely personal decisions made based on the juror's unique life experience, personal philosophy, and walk in life. There is no one "correct" answer or single objective truth. If jurors disagree, this doesn't mean that one juror's personal moral judgment is right and the other's is wrong. Citizens may disagree about these issues, but we each have the right to make these types of moral decisions for ourselves. What may be the right decision for a juror sitting next to you may be different than what is right for you. This diversity — in our personal moral judgments, in our freedom and right to be respected in these judgments — was a principle held dearly by the founding fathers of this country. Will you respect the right of the other jurors to arrive at their own personal *moral judgment*, regardless of whether you agree or disagree with the ultimate decision?

A: Yes, I certainly will.

### Group Decision v. Individual, Personal Judgment

Each juror is required to make an individual determination about the existence of and weight to assign to mitigating factors. It is to be expected that when jurors then weigh the aggravating and mitigating factors and arrive at an individual personal moral judgment regarding the ultimate sentence — death or life imprisonment without the possibility of release — that the jurors may arrive at different results. If the law is never going to require that a juror do violence to his or her conscience regarding this life or death decision, the law must recognize that it is lawful, appropriate, and legitimate that a sentencing jury may arrive at a nonunanimous decision as to sentence.

These constitutional principles guide juror sentencing decision-making, and the government commits prosecutorial misconduct if it misinforms jurors that a nonunanimous vote is an illegitimate exercise in jury nullification.[14]

This portion of voir dire may proceed as follows.

Q: In the "guilty / not guilty" trial, the jurors make a group decision. It takes 12 to convict or 12 to acquit. Again, *12 Angry Men* portrays the process of the jurors arriving at a group factual determination. Are you familiar with this deliberation process?

A: Yes

Q: If it is not unanimous it is a "hung jury." Are you familiar with this term? This is not a legitimate outcome. The jury did not complete its task.

Q: Unlike a normal trial, or *12 Angry Men*, the decision in a sentencing trial is not a group or collective decision. At the end of the day, each juror must decide the penalty for himself or herself. In this sentencing trial it is as if there were 12 separate judges, each arriving at the sentencing decision based on their personal judgment. (Prosecutors may object and assert that the defense is suggesting the jurors avoid deliberation. This is not the case. A juror is always free to share his or her views and to listen to the views of other jurors. But a juror is never required to explain, justify, or put into words a vote for life or a vote for death.) And the law does not provide the ultimate answer. At the end of the process, the court does not provide a check-the-box form that a juror can fill out, and the form then tells the juror the correct punishment to impose. (This is a critical concept. Most prospective jurors do not understand that each juror actually makes the life or death decision. People want to avoid or distance themselves from this moral responsibility. In order to intelligently exercise peremptory challenges, defense counsel must learn the prospective juror's feelings and views about the prospect of having this responsibility as a juror if the case proceeds to a sentencing trial.) Do you understand this?

A: Yes, I understand.

Q: Do you understand there is no such thing as a "hung jury" in a sentencing trial?

Q: Each juror decides the penalty based on the juror's life experience, personal philosophy, and common sense. And it takes 12 votes for death to be imposed. This means that if any one juror chooses life, based on that juror's personal moral judgment, then the defendant will be sentenced to life imprisonment without release. This means that each juror has the authority, power, and lawful right to

THE COLORADO METHOD

THE COLORADO METHOD

impose a sentence of life imprisonment. Do you understand this?

A: Yes. It is a tremendous responsibility the law gives to each juror.

### Confirm Juror Understands Mitigation: Definition, Burden, and Nonunanimity

If the defense attorney has developed a strong record for a cause challenge on a pro-death juror, the attorney should normally avoid discussing mitigation in this final portion of voir dire because the defense does not want to give the juror the opportunity to damage the record. For other pro-death jurors, the defense ensures the juror understands the concept of mitigation and focus on respecting the decision of other jurors regarding mitigation. For potential life-giving jurors, the defense also ensures an understanding of mitigation, but broadens the focus to convey the power each juror has with respect to mitigation.

Q: Do you understand that each juror assigns the weight or significance that the juror feels is appropriate to any mitigating circumstance that exists and may give any one mitigating circumstance sufficient weight or significance to outweigh the aggravation and any other evidence in the case?

For a potential life-giving juror, the defense may also ask questions that address mitigation themes to explore the juror's level of receptivity and interest. This may help the defense refine its juror rating and use peremptory challenges more effectively.

Q: Mitigating evidence is evidence that supports, for any individual juror, a sentence less than death. Mitigating evidence is whatever is important to any individual juror. There is no requirement that it be found by any other juror for it to be considered, and if it is found to exist by a preponderance (simply more likely than not), then the juror assigns the weight he or she believes is appropriate to it. It can be such things as [tailor carefully and not too directly to the mitigation themes] a person behaves well in the structured and secure environment in prison, that he can have a positive influence on family and friends even while living the rest of his life in prison, or that others sharing responsibility for the murders have not been held accountable or punished. It can be based on the concept of mercy alone. A juror once mentioned that she saw a spark of humanity in a defendant, a guilty killer, when he smiled at his mother as she entered the courtroom, and this spark of humanity can be a mitigating circumstance sufficient to choose life. Or a juror believing the defendant — who will die in prison — is not beyond redemption. It is whatever is important to each juror, and it may even be based on a feeling that a juror cannot put into words. Will you respect the right of every juror to consider and give effect to whatever mitigation he or she feels exists in the case, and refrain from criticizing a juror with whom you disagree?

Q: If a fellow juror says he votes for a life penalty based on the mitigation he believes is present, and the juror says he does not want to put these reasons into words, will you promise to refrain from criticizing the juror, even if you disagree with this vote on mitigation or disagree with the vote on life or death?

### Respect Each Juror's Right And Responsibility to Make These Sentencing Decisions Individually

Q: The law recognizes that the decision about whether another human being lives or dies is a serious decision, and each juror is given the right and responsibility to decide this issue for himself or herself; the law never requires or forces a juror to vote against his or her personal moral judgment or personal conscience. Do you understand this?

A: Yes.

Q: If you got together with 11 strangers, you would be surprised, would you not, if each of you followed the same religious faith, each of you disciplined your children in the exact same way, and each of you decided to marry or find a partner with identical character and personality traits? We expect a group of people to arrive at different decisions on these important topics because they involve personal and moral judgments. And in fact here, in a capital murder case in which the penalty of life imprisonment without the possibility of release or death may be an option if Mr. Defendant is convicted, the law recognizes that the jurors may arrive at different decisions about the penalty. If this occurs the foreperson merely writes on the verdict form, "We respectfully agree to disagree" and the law then provides that a sentence of life imprisonment without any possibility of release will be imposed. Do you understand that the law recognizes that each juror must arrive at his or her own decision?

A: Yes.

Q: Do you understand that the law permits you to agree to disagree, and the law accepts that as a valid outcome resulting in a sentence of lifetime imprisonment?

A: Yes, I do.

### The Law Never Requires A Juror Vote for Death

Many jurors erroneously believe that the death penalty is mandatory in certain types of cases.[13] Defense counsel must inquire of the prospective juror if she holds this erroneous belief and then obtain a confirmation from the prospective juror the she understands that a death sentence is never mandatory and that the law never requires a juror vote for death.

"The law never requires a juror vote for death. The only parties in the courtroom seeking the death penalty are the prosecutors. The judge has no interest in any particular outcome; she will be perfectly satisfied with whatever result you decide."

Q: It takes 12 votes for death for a death sentence to be imposed, and one vote for

---

NACDL, Southern Center for Human Rights, the University of Colorado Wolf Law School, and David Wymore co-sponsor an outstanding two-and-a-half day Colorado Method voir dire seminar once or twice a year. (Contact the Southern Center for Human Rights at 404-688-1202 to obtain information about the seminar.) Mastering this method of voir dire requires practice. Defense attorneys in federal capital trial cases can contact the Federal Death Penalty Resource Counsel Project (www.capdefnet.org/fdprc/) or Matthew Rubenstein to obtain additional materials and resources to learn or implement this method of jury selection, for assistance in tailoring the method to their cases, or for assistance in preparing for or conducting voir dire.

life, for life imprisonment without release to be imposed. This may strike some as unfair: the government has to get 12 votes; the defense only needs one. But this is the law. If you are a juror and the case proceeds to a sentencing trial, are you confident you can serve your function as a juror under this system?

## Jurors Never Have to Explain Their Feelings or Votes and Each Juror's Decision Will Be Respected

In order to reduce the likelihood of pro-death jurors employing unlawful coercive tactics in the sentencing trial deliberations, the defense must inquire of each juror if she will respect the principled decisions arrived at by her fellow jurors, regardless of whether or not she agrees with the ultimate sentencing decision of the other jurors. "You will respect the jurors even if you disagree with their sentencing decision, correct?"

Q: At a sentencing trial, if we get there, after the presentation of evidence and argument, each juror makes an individual, personal moral judgment about the aggravation and the mitigation. If a juror wants to put into words or explain why she voted a particular way on aggravation or mitigation, or how she feels about a life or death sentence, the juror can do so. By the same token, a juror is never required to put into words or explain her feelings, views, or vote. The law requires that jurors are entitled to always be treated with dignity and respect — by each other, by the lawyers, by the court — and justice requires, and this process only works when the right and responsibility of each juror to make these personal moral judgments are honored and respected. Will you agree to avoid bullying or pressuring a fellow juror to justify his or her decision?

"From beginning to end, judicial proceedings conducted for the purpose of deciding whether a defendant shall be put to death must be conducted with dignity and respect."[14]

Q: In a penalty phase, if we get there, justice requires that all of us honor and respect the individual, personal moral judgment by which each juror makes the ultimate decision; the individual nature of the decision-making process is what is critical. The decision each juror makes — whatever that decision may be — will be respected. Do you understand this and will you abide by it?

## Sentencing Trial Decision-Making Principles Poster

Using a poster or computer-generated slide presentation containing sentencing trial juror decision-making principles in voir dire facilitates more efficient and effective questioning about these principles and the prospective juror's willingness and ability to apply them. Moreover, using a visual aid makes this final portion of the voir dire move along more smoothly.

Figure 3 shows an example of these sentencing trial principles for a federal capital case.

If an attorney is not permitted to use a poster listing these or similar principles, the attorney must still ask questions designed to confirm the jurors understand these principles and will apply them.

## Conclusion

Many defense teams have used the Colorado Method of capital voir dire effectively in state and federal courts and obtained life verdicts in extremely difficult cases tried in challenging jurisdictions. The most effective way for defense counsel to learn these skills and techniques is by attending a Colorado Method voir dire seminar. These skills-based seminars teach the Colorado Method in small group sessions in which attorneys practice the language and concepts with mock jurors.

*The author acknowledges David Wymore, the former chief trial deputy for the Colorado Public Defender System, and his colleagues who developed the Colorado Method of capital voir dire for training capital defenders across the United States (including this author).*

### Notes

1. See Bowers & Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness From Capital Sentencing*, 39 CRIM. LAW BULLETIN 51 (2003), and http://www.albany.edu/scj/CJPpubs.htm for additional publications based on National Science Foundation-funded and peer reviewed Capital Jury Project Research.

2. *Wellons v. Hall*, ___ U.S. ___, 130 S. Ct. 727, 728 (2010) (per curium) ("From beginning to end, judicial proceedings conducted for the purpose of deciding whether a defendant shall be put to death must be conducted with dignity and respect.").

3. See Haney, *On the Selection of Capital Juries: The Biasing Effect of the Death-Qualification Process*, 8 LAW & HUM. BEHAV. 121 (1984); Haney, *Examining Death Qualification: Further Analysis of the Process Effect*, 8 LAW & HUM. BEHAV. 133 (1984); Haney, Hurtado & Vega, *'Modern' Death Qualification: New Data on Its Biasing Effects*, 18 LAW & HUM. BEHAV. 619 (1994); Cowan, Thompson & Ellsworth, *The*

**Figure 3**

### Sentencing Trial Decision-Making Principles

- ❖ The law does not provide the answer on the ultimate issue.
- ❖ The law is always satisfied with a life penalty.
- ❖ Each juror assigns the weight or significance the juror feels is appropriate to any mitigating circumstance that exists.
- ❖ Each juror is called upon to make an individual, personal moral judgment in deciding life or death, and there is no criticism of another juror's personal moral judgment.
- ❖ Even if all the jurors agree on the facts, it remains for each juror to decide which sentence is more appropriate — life imprisonment without any possibility of release or death.
- ❖ Each juror may lawfully vote for a life penalty based on a mitigating circumstance found to exist, including mercy, or even if no mitigating circumstances exist.
- ❖ A juror is never required to justify, explain, or put into words a reason to vote for a life penalty.
- ❖ One vote for life means a life penalty will be imposed.
- ❖ A nonunanimous decision on the life or death decision is legitimate and lawful and results in the imposition of a life imprisonment sentence.
- ❖ Every juror is entitled to be treated with respect and dignity, and each juror's vote will be respected.

THE COLORADO METHOD

Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation, 8 LAW & HUM. BEHAV. 53 (1984).

4. See note 9.

5. 469 U.S. 412, 424 (1985) ("That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'").

6. "[A] juror might be excused for cause if he or she would refuse to consider any mitigating evidence in a case involving the death of a child. Other jurors may have biases regarding particular forms of mitigating evidence. For example, some jurors may be unable to fairly consider any mitigating evidence relating to the defendant's background or upbringing. Such jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing." United States v. Fell, 372 F. Supp. 2d 766, 771 (D. Vt. 2005) (citations omitted). "Under the Eighth Amendment, a capital defendant is entitled to a sentencer who will consider any relevant mitigating evidence. Accordingly, the defendant can challenge a prospective juror for cause on the ground that the juror would not consider certain kinds of relevant mitigating evidence." United States v. Fell, 372 F. Supp. 2d 786, 791-92 (D. Vt. 2005).

7. See, e.g., Anderson v. State, 196 S.W.3d 28, 40 (Mo. 2006) (juror who indicated that he would put the burden on the defense to convince him that the defendant did not deserve the death penalty is constitutionally impaired, amounts to structural error, and a death sentence imposed by a jury tainted with structural error must be vacated, citing Gray, 481 U.S. at 660, 107 S. Ct. 2045).

8. "[T]he court holds that, in this case, 'case specific' questions are appropriate — indeed, necessary — during voir dire of prospective jurors to allow the parties to determine the ability of jurors to be fair and impartial in the case actually before them, not merely in some 'abstract' death penalty case." United States v. Johnson, 366 F. Supp. 2d 822, 850 (N.D. Iowa 2005) (emphasis in original).

"There is a crucial difference between questions that seek to discover how a juror might vote and those that ask whether a juror will be able to fairly consider potential aggravating and mitigating evidence. For example, a juror may not be asked whether evidence of rape would lead him or her to vote for the death penalty. However, a juror may be asked if, in a murder case involving rape, he or she could fairly consider either a life or death sentence. The first question is an improper stake-out question. The second question is not a stake-out question because it only asks whether the juror is able to fairly consider the potential penalties. To the extent that this question 'commits' a juror, it 'commits a juror to no other position than fair consideration of the appropriate penalty in light of all of the facts and the court's instructions.'" United States v. Fell, 372 F. Supp. 2d 766, 771 (D. Vt. 2005) (citations omitted).

9. United States v. Johnson, 366 F. Supp. 822, 849 (N.D. Iowa 2005) (emphasis in original).

10. See Johnson at 849.

11. Id. at 848.

12. In a case governed by the challenging AEDPA review standards, the U.S. Court of Appeals for the Tenth Circuit reversed and remanded to the district court to grant 18 U.S.C. § 2254 habeas sentencing relief on five state death sentences based upon a coercive Allen charge that, when considered in the context of all surrounding circumstances, coerced the jury into returning death sentences. "As set out [below], it is clear the prosecutors' misconduct achieved its intended purpose: the jury was misled to believe it was the obligation of a juror holding a minority opinion to abandon that opinion if it was necessary for the jury to reach a unanimous sentence. The coercion flowing from this misconduct, when combined with coercion flowing from the trial court's Allen charge, undoubtedly coerced the jury's death sentences." Hooks v. Workman, 606 F.3d 715, 746 (10th Cir. 2010). Numerous district courts have instructed federal sentencing juries, in the main charge, that nonunanimity would result in a life sentence. In many of these cases, the court has also given jurors the explicit option of a nonunanimous verdict on the verdict form. See, e.g., United States v. Sampson, 335 F. Supp. 2d 166 (D. Mass. 2004) (court informed jury of consequences of nonunanimity because this emphasized individual responsibility of each juror and ensured each was fully informed of consequences of his or her actions).

13. See Scott Sundby, War and Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 HASTINGS L.J. __, *60-61, available at http://ssrn.com/abstract=1604572 (2010) (providing numerous examples of potential life-giving jurors being pressured by a death majority and suggesting methods for defense counsel to conduct voir dire and present argument to help potential life-giving jurors remain true to their individual, personal moral judgment and return life from the jury room); see also Scott Sundby, A Life and Death Decision: A Jury Weighs the Death Penalty (2005), which recounts a fascinating and harrowing capital sentencing jury deliberation, the interpersonal dynamics and psychological pressures and responses that influence the life or death decision-making process, and the manner in which the sentencing decision is framed by jurors.

14. See, e.g., Hooks v. Workman, 606 F.3d 715, 742-43 (10th Cir. 2010) (prosecutor's statement to capital sentencing jury that (1) defense counsel's argument that it took the vote of only one juror to prevent imposition of the death penalty constituted a request for jury nullification, and (2) that failure to deliberate in a manner leading to a unanimous verdict would amount to operating outside the law constituted intentional misconduct designed to misinform the jurors).

15. See note 1 at 72 (Approximately half of the jurors interviewed by the Capital Jury Project believed that the death penalty was required if either of two commonly found aggravating factors were established.). See also John Blume, Theodore Eisenberg & Stephen P. Garvey, Lessons From the Capital Jury Project, in BEYOND REPAIR? AMERICA'S DEATH PENALTY 144-77 (2003), Ronald C. Dillehay & Marla R. Sandys, Life Under Wainwright v. Witt: Juror Dispositions and Death Qualification, 20 LAW & HUM. BEHAV. 147 (1996), William S. Geimer & Jonathan Amsterdam, Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials, 15 AM. J. CRIM. L. 1, 40 (1989).

16. Wellons, supra.

### About the Author

Matthew Rubenstein is a full-time National Capital Resource Counsel and member of the Federal Death Penalty Resource Counsel Project. He has taught the Colorado Method at numerous seminars, helped defense teams from jurisdictions across the United States prepare to use the Colorado Method, and conducted Colorado Method jury selection in 11 capital cases.

Matthew Rubenstein
Capital Resource Counsel
Office of the Federal Public Defender
101 SW Main St., Ste. 1700
Portland, OR 97204
503-780-3535
matt@matthewrubenstein.com