IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| DYLANN STORM ROOF | ) | |

**DEFENDANT'S MEMORANDUM RESPECTING
JURY SELECTION PROCEDURES**

The Court's Order of June 7, 2016, Dkt. No. 179, required the parties to confer on the matter of jury selection procedures and to submit to the Court on or before June 24, 2016, a joint proposal regarding any areas of common agreement, and separate proposals regarding any areas in dispute. On June 23, the parties filed a document containing a chart setting forth both the issues on which they have reached agreement, and those on which they have not. Dkt. No. 206.

The areas of disagreement are whether

1. to draw a venire from Area C alone or from the entire District of South Carolina;

2. to permit limited follow-up voir dire questioning of jurors by counsel, and

3. to utilize a strike-as-you-go method of exercising peremptory challenges rather than to delay all peremptory challenges until the Court has qualified a pool of jurors large enough to permit each side to exhaust all of its allotted challenges (plus an extra half-dozen for good measure).

These three areas are discussed below.

1.  **Area C Venire**

The defense has already filed notice that it has no present intention of filing a motion for a change of venue, and knows of no reason why the Court should recede from its previously-expressed willingness to draw a jury from the general vicinity of Charleston. (Dkt. No. 196). Thus, the defense is requesting that the jury be randomly drawn from the Charleston and Beaufort Divisions (Area C of the Amended Jury Selection Plan of the District of South Carolina). The selection of a local jury in capital cases is in keeping with a preference expressed by the First Congress in the earliest months of our Nation's constitutional system, and still reflected in 18 U.S.C. § 3235 ("the trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience"). While not directly controlling the selection of the jury venire here, § 3235 does serve as a reminder that all else being equal, capital trials should be conducted close to the site of the offense.

The government nevertheless asserts that utilizing a district-wide jury "may well be prudent . . . . absent a waiver of any venue challenge by Roof." Government's Request for District-Wide Jury Pool if Roof Refuses to Waive any Venue Challenge, Dkt. No. 194 at 2. It is unclear whether the government regards the defendant's response to the Court's inquiry as to his present intention to move for change of venue as inadequate. Regardless, the government makes no suggestion that a fair jury cannot be had in Area C, and the defense believes that it can be. The government has therefore offered to reason why the Court should change direction on this point.

## 2.    Individual, Sequestered Voir Dire with Questioning by the Court and Follow-Up Questioning by Counsel

This Court has already indicated at the June 7, 2016 Bar Meeting that it envisioned conducting the voir dire of prospective jurors itself, but was inclined to allow limited follow-up questioning by counsel.   That is what the defense is also proposing.

The government, on the other hand, proposes that follow-up questions first be submitted by counsel to the Court, that the Court review the questions, and thereafter that the Court conduct the follow-up questioning.  In effect, the government would require the Court to conduct all of the jury voir dire in this case.  That approach would likely prove relatively cumbersome and inefficient compared to the benefits of limited and focused direct inquiry by counsel for the parties.    The government's approach is also a less effective way to ferret out potential bias on the part of the potential jurors, for the reasons articulated below.

Though attorney participation in voir dire questioning is rare in federal courts throughout the nation, the practice has become commonplace in federal capital cases. Federal judges have permitted attorney-conducted questioning of prospective jurors in the large majority – over 80 percent – of death penalty cases to have been tried in the post-*Gregg* era. *See* Exhibit 1, Declaration of Kevin McNally Regarding Jury Selection Practices, January 18, 2016, at ¶ 5 (stating that "In the vast majority of federal capital trials, attorneys are permitted to ask the jury questions.  As of January 15, 2016, jury selection has begun 230 times in a federal capital case.  Attorney questioning of potential

jurors was allowed in 189 (or 82%) of these trials"). The authors of the Federal Judicial Center's *Resource Guide for Managing Capital Cases* (rev. 2004) likewise report:

> Judges in death-penalty cases have taken a number of approaches with respect to allowing attorney participation in the voir dire process. Most have allowed attorney participation in some form, even if this is not their standard procedure in criminal cases. Most frequently, judges allow attorneys to question the jurors directly, often placing a time limit on the questioning of each juror.

*Resource Guide* at 35 (http://www.fjc.gov/library/fjc_catalog.nsf) (last viewed June 22, 2016).

This nearly complete reversal of the federal courts' usual approach to attorney-conducted voir dire likely reflects that the usual objections to such questioning – that lawyers waste time or try to "indoctrinate" jurors with their view of the case – have much less force in capital cases. In such cases, there is simply no time to waste. The Court and the parties must probe and test jurors' actual beliefs and views, particularly as they concern capital punishment, in areas where bias can be difficult to bring to the surface. While no system for screening jurors will ever be foolproof, *see United States v. Sampson*, 820 F. Supp. 2d 151 (D. Mass. 2011) (juror's dishonest responses on voir dire required court to order new capital sentencing trial), allowing counsel for the parties a brief opportunity to probe jurors' views directly enhances the likelihood that any disqualifying biases will be detected in time. Effective probing in jury selection is well worth the time and effort required to properly empanel an impartial jury.

The Supreme Court has cited the ability of defense counsel to participate in voir dire questioning as evidence of the fairness of the process, and of the reliability of the trial judge's eventual rulings on cause challenges. *E.g., Wainwright v. Witt*, 469 U.S.

4

412, 434-435 (1985) (defense counsel's decision not to question anti-death penalty juror supports inference that she was properly excused); *Skilling v. United States*, 561 U.S. 358, 372, 374, 388 n.22, 389 (2010) (noting, as evidence of the adequacy of the voir dire examination, that trial court allowed counsel to pose follow-up questions to prospective jurors). Allowing brief attorney-conducted questioning reduces post-trial speculation about what additional probing might have revealed about possible juror bias, and creates a more reliable record for appellate review.

    Allowing counsel to question jurors is also more effective for exposing bias because jurors are more likely to be honest about their views when questioned by attorneys rather than by judges. Social science research has long shown that people are more willing to disclose information to those whom they perceive as having similar status to themselves than to those of higher status. Suggs & Sales, *Juror Self-Disclosure in the Voir Dire: A Social Science Analysis*, 56 Ind. L.J. 245, 268 (1981) ("A large status differential between the interactants will most likely reduce perceived similarity and, in turn, the degree of self-disclosure"). In court, the judge sits elevated, wears distinctive attire and is addressed as "Your Honor"—all of which emphasize the difference in status between the judge and everyone else in the room. See also Susan E. Jones, *Judge-Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor*, 11 Law & Hum. Behavior, 131, 143 (Jun. 1987) ("subjects were considerably more candid in disclosing their attitudes and beliefs about a large number of potentially important topics during an attorney-conducted voir dire"). The effect appears to be a response to the authority of the judge's role and the respect afforded to judges, and has little to do

with the particular judge's personality or style of questioning.  Answering to an esteemed figure, such as a judge, encourages potential jurors' tendency to offer the "socially desirable"—rather than the most accurate—response. Neil Vidmar, *When All of Us Are Victims: Juror Prejudice and "Terrorist" Trials*, 78 Chi.-Kent L. Rev. 1143, 1150 (2003) ("The tendency to provide such [socially desirable] answers can be enhanced by the authoritative presence of the judge").

>     A federal judge who has presided over two capital trials explained:
>
>> [E]mpirical research suggests that potential jurors respond more candidly and are less likely to give socially desirable answers to questions from lawyers than from judges. As a district court judge for over fifteen years, I cannot help but notice that jurors are all too likely to give me the answer that they think I want, and they almost uniformly answer that they can "be fair."

Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 160 (2010); *see also* Hans and Jehle, *Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir Dire Process in Jury Selection*, 78 Chi.-Kent L. Rev. at 1194 ("The judge's approval is important to a lot of prospective jurors and many will alter their responses or hide certain attitudes in order to be perceived favorably"). The parties and the Court will need accurate and complete information from potential jurors to assess whether they are qualified to serve in a trial with life-or-death stakes. Both experience and social science

research demonstrate that a voir dire process that includes questioning by counsel best facilitates juror honesty.[1]

The Supreme Court has referred to attorney questioning as a means of ensuring jury impartiality in capital cases. "'As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, *through questioning*, that the potential juror lacks impartiality. It is then the trial judge's duty to determine whether the challenge is proper.'" *Morgan v. Illinois*, 504 U.S. 719, 733 (1992) (quoting *Witt*, supra, 469 U.S. at 423) (emphasis in *Morgan*); *see also Uttecht v. Brown*, 551 U.S. 12, 20 (2007) (trial court's ruling on a challenge for cause is entitled to deference when "there is lengthy questioning of a prospective juror and the trial court has *supervised* a diligent and thoughtful voir dire") (emphasis added).

In effect, the Supreme Court has recognized that asking certain questions--those aimed at disqualifying jurors who are at one extreme or the other or seeking to rehabilitate those apparently unqualified--is a partisan function. As such, it is more appropriate for advocates than impartial judges. Conversely, the judge's role of modeling neutrality, and of educating and instructing jurors, can make it difficult for the judge to aggressively probe jurors' true views. As Judge Bennett has remarked:

> There is also a temptation, not always resisted on my part, to pose questions with the intent of educating jurors about proper responses, in light of the presumption of innocence or other

---

[1] By contrast, one analysis observed that "there is no objective data to support the assertion that a judge is more likely than partisan counsel to obtain an impartial jury." Suggs & Sales, *Juror Self-Disclosure in the Voir Dire: A Social Science Analysis*, 56 Ind. L.J. 245, 268 (1981).

7

>considerations in the trial. Thus, the trial judge is probably the person in the courtroom least able to discover implicit bias by questioning jurors.

Bennett, *supra*, at 160.

This division of responsibilities is practical. As discussed above, it is often necessary to ask jurors specific questions about the type of case they could be hearing. Before trial, attorneys know the evidence best and are in the best position to frame those questions with relevant follow-up. *United States v. Ible*, 630 F.2d 389, 395 (5th Cir. 1980) ("[V]oir dire may have little meaning if it is not conducted at least in part by counsel. . . . [I]t is the parties, rather than the court, who have a full grasp of the nuances and the strength and weaknesses of the case").

Attorney participation in voir dire is also efficient. Allowing counsel to ask a limited number of relevant questions of jurors is more expeditious than requiring counsel for both sides

- to propose specific questions in writing, in advance, concerning each potential juror;
- to make requests throughout jury selection for follow-up questions of individual jurors;
- to make objections for each individual juror questioned regarding questions not asked; and
- to file motions throughout the process.

Finally, allowing attorney-conducted questioning reduces post-trial speculation about what additional probing might have revealed about possible juror bias and creates a more reliable record for appellate review.

For all these reasons, limited attorney-conducted follow-up questioning in federal capital cases ultimately makes the jury selection process more rather than less efficient, and should be allowed in this case.

**3.     "Strike As You Go" Method of Exercising Peremptory Challenges**

A "strike as you go" process would be implemented as follows. At the conclusion of each juror's individual voir dire, the potential juror would be temporarily excused from the room where the questioning has taken place, and the Court would hear and decide any cause challenges raised by the parties. If the potential juror is not excused for cause, the parties, alternating the order, would be required either to accept the juror or exercise a peremptory challenge. If the potential juror is not excused by the use of a peremptory challenge, the individual becomes a seated juror for the trial. If a juror is seated, the juror will serve: no subsequent peremptory striking (sometimes referred to as "back-striking") would be permitted.

Each day, those jurors not excused for cause would be sent home with instructions to remain on call for the start of the trial. This process would continue until the requisite number of trial jurors has been reached. After the parties exhaust their peremptory challenges or agree upon a panel, six alternates will then be selected utilizing the same process.[2] The alternative, as proposed by the government, is to pre-qualify a jury pool of

---

[2] In order to preserve the ability of each party to make appropriate motions under *Batson v. Kentucky*, jurors who have been peremptorily challenged would not be notified of that fact until any such *Batson* challenges were disposed of, or until the time for making them had elapsed. It would not be necessary, however, for peremptorily challenged jurors to return to court once a jury of twelve members and six alternates was finally selected.

9

approximately 70 individuals and then have those 70 individuals return to Court for the exercise of peremptory challenges.

The benefit of the defendant's strike-as-you-go proposal is that it would minimize the time and effort spent qualifying or excusing individual jurors, because the process ends when both sides are satisfied with the trial jury. The government's procedure, by contrast, would end only after the maximum possible number of jurors has been qualified, as it embodies the assumption that each side will utilize every last available peremptory challenge on both trial and alternate jurors. But that assumption is a worst-case scenario that need not be built into the jury selection process. Put differently, a strike-as-you-go system allows for the possibility that each side will not exhaust its peremptory challenges, and in this way may allow the Court to complete jury selection after having qualified substantially fewer jurors. For example, if each side was satisfied with the jury after using only 15 of its 20 challenges, and only one of its three alternate challenges, the Court would be able to empanel a jury after qualifying only 50 jurors, rather than the minimum of 64 (or 70, under the government's proposal) that will be inflexibly required under the system advanced by the government.

Death-qualifying and life-qualifying a capital jury, especially in a highly-publicized case such as this, is a laborious and time-consuming process—much more so than in the ordinary criminal case, where striking from a qualified panel may be the norm. The savings in time, judicial resources, and stress on prospective jurors resulting from using a strike-as-you-go system may prove very large, and justify using such a system instead of that proposed by the government.

## CONCLUSION

In summary, the parties have agreed on a basic structure for the jury selection process (Dkt. No. 206). With regard to the areas where the parties do not agree, the defense respectfully submits that (1) the panel should be drawn from Area C; (2) individual, sequestered jury selection should be conducted with limited follow-up questioning permitted by counsel for the government and for the defense; and (3) the parties should exercise peremptory challenges immediately following the questioning of each individual juror so as to promote efficiency in the jury-selection process.

Respectfully submitted,

s/ *David I. Bruck*
David I. Bruck
Washington & Lee School of Law
Lexington VA 24450
540-458-8188
bruckd@wlu.edu

Michael P. O'Connell
PO Box 828
Mt. Pleasant, SC 29464
843-577-9890
moconnell@stirlingoconnell.com

Attorneys for Dylann S. Roof