IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

**FILED UNDER SEAL**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| DYLANN STORM ROOF | ) | |

## <u>DEFENDANT'S MOTION IN LIMINE</u>

The defendant, through counsel, submits this motion in limine to exclude specific evidence, and to impose limits on certain categories of evidence, that the government may introduce at trial.  By agreement of the parties, as described in more detail below, the defendant requests that the Court permit the defense to move at a later date to exclude additional items based on the government's exhibit list.  This motion is filed under seal pursuant to Court order.  *See* Dkt. No. 322.

I.     **The parties request leave of Court to file additional motions in limine following the identification of trial exhibits.**

The parties have conferred regarding the types of evidence that may be offered. To the extent practicable, the parties have identified and presented challenges to specific items or types of evidence that they would seek to exclude regardless of the nature of the particular exhibit identified.  However, both parties acknowledge that until exhibit lists are identified in October pursuant to the Court's schedule, attempts to anticipate and object to each particular exhibit would create unnecessary litigation. Therefore, the

parties agree that additional objections to particular exhibits may be made after the exhibit list disclosures are made.

In particular, there are four broad categories of evidence from which the government may select trial exhibits: crime scene photographs, autopsy photographs,[1] items recovered from digital media, and Charleston County Detention Center audio recordings. There are hundreds of items of evidence in these categories that the government may choose to include on its October 10 exhibit list (and that the defense may identify on October 17). For the reasons discussed above, the parties have agreed that each side may interpose additional motions in limine following identification of particular exhibits in these categories, and we request leave of Court to do so.

## II.    Evidence regarding churches other than the Emanuel AME Church should be excluded as irrelevant, unnecessary, and unduly prejudicial.

In discovery, the government provided the following materials relating to churches other than the Emanuel AME Church, the location of the crimes at issue in this case:

(1) two photographs of the Branch AME Church located at 482 Jedburg Rd., Summerville, SC, *see* Exhibit 1 (attaching US017589 & US017590);

(2) a hand-written list of churches found in the defendant's car after his arrest that includes Emanuel AME but not Branch AME, *see* Exhibit 2 (attaching US001631); and

---

[1] The government has indicated it does not presently plan to use autopsy photographs and will notify defense counsel if its intentions change.

(3) GPS data showing that the defendant (a) took the Jedburg Road exit from I-26 while leaving Charleston after the crime, and passed by the location of the Branch AME Church, and (b) had on earlier dates travelled near other churches, some included on the list found in his car and some not.

The government has not offered a theory of admissibility for these items, which are irrelevant, unnecessary, and unduly prejudicial. Such "evidence" should not be admitted at trial.

According to our best interpretation of the evidence,[2] the photographs and GPS data appear to indicate two things. First, en route from Charleston to Shelby, NC (the location of his arrest), the defendant passed by the Branch AME Church long after a 7:00 p.m. Wednesday Bible Study advertised on the church's sign outside the building would have concluded (assuming it had been conducted at all). It appears that the GPS device was briefly turned off, and then back on, in the general vicinity of the church, but there is no indication that the defendant stopped or even slowed down as he passed by. Given the large number of AME churches in South Carolina, he also drove nearby many other AME churches between Charleston and Shelby, but there is no evidence that he approached any of them. [3]

---

[2] We note that the government has not provided notice pursuant to Federal Rule of Evidence 404(b), despite our formal request for such notice. *See* Dkt. No. 31. Nor does the government's Federal Rule of Criminal Procedure 16 disclosure explain how the voluminous digital media and GPS tracking data will be used at trial. Rather than providing a "written summary of [] testimony", as required by the rule, the government has offered only a technical description of its experts' review of the data. *See* Dkt. 319. This makes it very difficult for the defense to lodge objections.

[3] It is likely coincidental that the defendant passed these churches. *Cf.* http://www.ame7.org/index.php (noting that the AME ministries in South Carolina serve over

Second, during the months before June 17, 2015, the defendant visited a variety of historical sites in the Columbia, Greenville, and Charleston areas and drove in the vicinity of several churches.  There is no photographic or other corroborating evidence of his being in the vicinity of these churches, and the government has provided no interpretation of its GPS data (though, as noted, this should have been provided in the Rule 16 expert disclosure).

There are two bases for admitting evidence of conduct not directly related to the charged offenses:  either as intrinsic evidence, or under Federal Rule of Criminal Procedure 404(b).  Intrinsic evidence involves other acts not charged, but "that ar[i]se out of the same ... series of transactions as the charged offense, ... or [are] necessary to complete the story of the crime (on) trial."  *See United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994) (internal quotation marks and citation omitted).  Section 404(b) evidence is other acts offered to prove the defendant's "'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident'" in committing the charged offense.  *United States v. Byers*, 649 F.3d 197, 206 (4th Cir. 2011) (citing *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009)).

Whether offered as intrinsic evidence or 404(b), "other acts" evidence is not admissible unless it is both necessary to the government's case, *cf. United States v. Mark*, 943 F.3d 444, 448 (4th Cir. 1991) (holding that "upon a review of the record as a whole, we do not find the evidence against Mark … to be so strong and unassailable as to make

---

500 churches).

[the other acts] testimony unnecessary as we interpret the meaning of that term"), and meets the strictures of Federal Rule of Criminal Procedure 403 – that its probative value outweighs the dangers of: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.[4]

The tests for intrinsic evidence and 404(b) evidence are slightly different, even though they overlap in the important ways just described. In considering intrinsic evidence, the Court examines whether the other acts and the charged offenses are "inextricably intertwined." *See Basham*, 561 F.3d at 326 (citing cases). The test for 404(b) evidence is more involved, and requires assessment of four factors:

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. . . . (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

*United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997) (citation omitted). The burden is on the government to establish that other acts are intrinsic or fulfill the requirements of Rule 404(b). *See Queen*, 132 F.3d at 997; *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004). *Cf. United States v. Brown*, 765 F.3d 278, 292-93 (3d Cir. 2014) ("[T]he

---

[4] To the extent the government may wish to offer some of the evidence at issue here in the penalty phase, 18 U.S.C. § 3593(c) provides arguably more stringent limits than Federal Rule of Evidence 403: "The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." Unlike Rule 403, this statutory provision does not require an objecting party to show that the probative value of challenged evidence be "*substantially* outweighed" by the dangers listed, but only that it be "outweighed."

prosecution must clearly articulate how that evidence fits into a chain of logical

inferences, no link of which can be the inference that because the defendant committed

[the proffered prior offense], he therefore is more likely to have committed [the charged

offense].") (internal quotation marks and citation omitted).

The risk of unfair prejudice is particularly high – and particularly consequential –

because this is a death penalty case in which there is a special obligation to guard against

determinations based on emotion and passion. *See, e.g.*, *Caspari v. Bolden*, 510 U.S. 383,

393 (1994) ("Time and again the [Supreme] Court has condemned procedures in capital

cases that might be completely acceptable in an ordinary case.") (quoting *Strickland v.*

*Washington*, 446 U.S. 668, 704 (1984)); *Beck v. Alabama*, 447 U.S. 625, 638 (1980) ("To

insure that the death penalty is indeed imposed on a basis of 'reason rather than caprice or

emotion,' we have invalidated procedural rules that tended to diminish the reliability of

the sentencing determination.  The same reasoning must apply to rules that diminish the

reliability of the guilt determination.") (quoting *Gardner v. Florida*, 430 U.S. 349, 358

(1977)).  *See also* 18 U.S.C. § 3593(c).

***Branch AME Church (Exhibit 1).***  The photographs of, and GPS data regarding,

the Branch AME Church are irrelevant, unnecessary and unfairly prejudicial.  The church

is located near the defendant's travel route from Charleston to Shelby, NC, where he was

arrested, and he exited I-26 at the first exit outside of Charleston without significant

commercial activity on to Jedburg Road, where he drove past the church and thereafter

travelled only on secondary roads.  The government has informed us that it has no

information beyond the photographs and the GPS data points showing this route tending

to link the defendant to the church or its activities.  Evidence regarding the church's location therefore has no probative value at all on any issue relating to guilt or penalty. The only possible reason for its introduction is to invite jurors to speculate that the defendant planned attacks on other churches – a proposition that is obviously inflammatory and for which there is no support.  The invitation to speculate and this evidence should be excluded.

   ***List of churches (Exhibit 2).***  The list of churches has similar evidentiary flaws as the Branch AME Church evidence.  Because it includes a reference to "Emanuel AME," the site of the charged offenses, it has arguable relevance; however, its minimal probative value – confirming that the defendant targeted Emanuel AME – is substantially outweighed by the prejudice created by the remainder of the list, which invites the same speculation discussed with respect to the Branch AME Church (that the defendant planned attacks on other churches).   Moreover, this particular reference to Emanuel AME is unnecessary and cumulative in the context of the remainder of the government's case, because there is ample other evidence that the defendant targeted that church for his attack, *e.g.*, that he had previously visited the church and that he had made phone calls to the church – indeed, he gave a statement discussing his choice of a target.

   ***Travel in the vicinity of churches.***  Without any interpretation of the government's GPS data, or any corroborating evidence that the defendant was in the vicinity of a particular church for a particular purpose, this "evidence" is too speculative to be probative and far too prejudicial to meet the strictures of Rule 403.

**III.    The Court should exclude the FARO computer-generated simulations of the crime scene as unreliable and unduly prejudicial, because they are not accurate depictions but dramatizations that involve editing of viewpoints and objects to create scenes that do not exist in the real world.**

The government has produced in discovery several computer-generated simulations that purport to depict the inside of the lower level of Emanuel AME Church, including the bodies of eight people, in the aftermath of the shootings.  The simulations were produced by FARO, a 3-D measurement and imaging company.  *See* http://www.faro.com/en-us/home.  The first simulation purports to show a "bird's eye" view of the crime scene.  A camera appears to travel around the perimeter of the church's ceiling, showing the entire interior as if the viewer were flying slowly above the crime scene looking down.  A second simulation begins outside the church, enters through the back door, and meanders around the crime scene, as if the viewer were walking in and wandering through the church.  A third video appears to be a black-and-white version of the second simulation.

In each simulation, the appearance of the crime scene has been altered in significant ways.  For example, in the first simulation, the ceiling of the church has been removed, making it appear as though there is open sky above the crime scene, and certain obstacles have been digitally altered to render them transparent, so that the viewer can "see through" tables and observe bodies, pools of blood, shell casings, and other items that were, in reality, otherwise blocked from sight.[5]  The simulations also include

---

[5] Copies of the simulations will be provided on thumb drives to the Court and the Clerk's Office within one business day of the filing of this motion.

animation effects, such as slow motion and use of perspective, which appear intended to create tone or mood.  There is no basis for admitting this distortion of reality in evidence, particularly when less prejudicial alternatives – such as actual crime scene photographs – are available.

### A. Although a FARO simulation may at first appear to be a true representation of the crime scene, its creation actually is more akin to a film production.

Although FARO simulations have the appearance of a traditional crime scene video or "walk through," they are in fact computer-generated compilations of thousands of individual photographs that have been manipulated in production.  The government has not explained how the simulations provided in discovery were generated.[6]  However, our research suggests that the simulations must have been produced using 3-D laser scanning, a relatively new technology.

The FARO scanner we believe to have been used in this case operates by using laser range finding and photography, coupled with proprietary software, to create an image.  First, a 3-D laser scanner is taken to a scene.  Then, targets are placed throughout the scene to create points of reference in the scan.  The scanner fires laser light around the scene in a 360-degree circle, completely covering the area except for a cone directly beneath the scanner itself.  This laser light is interpreted by the scanner by measuring

---

[6] If the government intends to offer this evidence at trial, expert testimony regarding the making of the simulations will be required to lay a foundation first.  *See* Fed. R. Evid. 901(a), (b)(9). The Court should require the government to supplement its Rule 16 expert disclosure accordingly.  Although we maintain that the evidence should be excluded, we request immediate Rule 16 disclosure so that we may prepare for the possibility that the Court may admit the evidence.

reflectivity and positional coordinates. While the scanner is taking the laser coordinates, it also is taking photographs of the scene. Much like with the laser, the camera in the machine takes photographs of the entire scene except for the cone directly beneath the scanner. Hundreds of these photographs are taken and compiled to create a color image of the scene. The compiling appears to create a honeycomb pattern, which is later removed by adjusting the image data.

Once a scan is complete, additional scans are taken in an effort to maximize reconstruction of the scene. The scanner is placed in sight of the targets and repeats the scanning and photographing functions. After several scans have been completed, a crime scene investigator uploads the data to a computer equipped with appropriate software (in the case of FARO, the software is known as SCENE). The data will then be visible as a "point cloud." In the case of several scans, the point clouds overlap as if they were all taken from identical grid points. Using the fixed targets that were placed around the scene, the investigator can then manually move the scans in an attempt to have them overlap, or can have the software attempt to do so.

After attempting to recreate the scene with point cloud data, the investigator can overlay the photographs onto the point cloud. This adjusts the photographs so as to demonstrate depth; in other words, this takes a 2-D picture and tries to make it 3-D. The image may then be altered in any further fashion desired. A video reproduction can be created from any perspective, position, or angle chosen by the investigator. The investigator can remove obstructions of vision or alter the image in any other way he or she wishes.

10

**B. Because FARO simulations are not accurate depictions of the crime scene, their probative value is substantially outweighed by the danger of unfair prejudice.**

The probative value of the FARO simulations in this case is low, particularly in comparison to the more accurate evidence the prosecution has available to present (such as crime scene photographs and autopsy reports). Meanwhile, these simulations pose great risk of unfair prejudice and misleading the jury, and involve needlessly presenting cumulative evidence. Because the dangers of presenting the FARO simulations substantially outweigh their probative value, the Court should exclude them from trial.

**1. The FARO simulations have low probative value because they amount to manufactured evidence. Traditional crime scene evidence is more probative.**

When assessing the probative value of the FARO simulations, the Court should compare them with less prejudicial, alternative evidence that the prosecution might introduce instead. *Old Chief v. United States*, 519 U.S. 172, 183 (U.S. 1997) ("[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives"). As the Supreme Court has explained, an evidentiary standard that does not require consideration of alternatives leaves the trial process open to gamesmanship.

> [Such an] understanding of the rule would leave the party offering evidence with the option to structure a trial in whatever way would produce the maximum unfair prejudice consistent with relevance. He could choose the available alternative carrying the greatest threat of improper evidence, despite the availability of less prejudicial but equally probative evidence. The worst he would have to fear would be a ruling sustaining a Rule 403 objection, and if that occurred, he could simply fall back to offering substitute evidence. This would be a strange rule. It would be very odd for the law of evidence to

11

> recognize the danger of unfair prejudice only to confer such a degree
> of autonomy on the party subject to temptation, and the Rules of
> Evidence are not so odd.

*Id.* at 183–84.  Thus, the Court should consider whether there is other evidence available to the prosecution that has similar probative value without the same risks of prejudice. *Id.* at 183–83 ("If an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it . . . .").

Here, the FARO simulations are no more probative than crime scene photos.  In fact, a FARO simulation is substantially *less* probative than a set of crime scene photographs because it is an inaccurate depiction of the crime scene.  Unlike a photograph, a FARO simulation is the product of a manufacturing process that creates opportunity for manipulation (and raises the concomitant possibility of human error).  In this case, the prosecution has taken full advantage of the opportunity, transforming the images into inaccurate but powerful depictions of the scene.  Because the images have been manipulated, however, the FARO simulations are not probative of how the scene truly appeared.  In contrast, crime scene photographs are unadulterated depictions, with a long history of use in criminal cases.

While crime scene photographs – which the government possesses – portray how the scene *actually* appeared, the FARO simulations suggest what it would be like to fly over the scene like a superhero with x-ray vision or to walk through the scene like the Terminator, able to see through opaque objects to locate victims.  The prejudice from such simulations cannot be overstated, particularly in the context of a capital case, where

12

the jury's interest in the details of the crime cannot be understated.  Although the prosecution has a "need for evidentiary richness and narrative integrity in presenting a case," *see Old Chief*, 519 U.S. at 183, a computer simulation does not better serve those needs than crime scene photos would.  If anything, "narrative integrity" is better served by presentation of evidence that has not been shaped to the government's needs.

### 2.     Any probative value in the FARO simulations is substantially outweighed by the risks it presents in this case.

The low probative value of the FARO simulations would be outweighed by even modest dangers.  *See United States v. Loughry*, 660 F.3d 965, 971 (7th Cir. 2011) ("There may be cases where the probative value of the evidence is so minimal that it will be obvious to the court that the potential prejudice to the defendant substantially outweighs any probative value the evidence might have.") (citing *United States v. Gonzalez-Flores*, 418 F.3d 1093 (9th Cir. 2005)); *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992) ("Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury.").  Admission of these FARO simulations, however, would create great danger of unfair prejudice, misleading the jury, and needlessly presenting cumulative evidence.

*Intense Emotional Reaction.*  The simulations are unfairly prejudicial because they may create an intense emotional reaction in the viewer.  *See* Fed. R. Evid. 403 advisory committee's note (explaining that unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional

one").  For example, in one simulation, the tone is set by the viewer's flight through the church door, behind which there is a backdrop of vivid skies.  The simulation creates a feeling that the viewer is floating, disembodied, over and around the crime scene.  This disembodiment sets a ghostly sort of mood, which is exacerbated by the slow-motion movement of the simulation and the transparency of the furniture and other objects in the images.  To the viewer, the simulation evokes not simply human observation, but the sense that the viewer might be like an angel, watching the victims from above.

Relatedly, the videos create the false impression that the defendant himself would have had a panoramic view of the carnage he had created in the ways shown on the FARO simulations, or that he could even see through solid objects.  While the viewer "knows" that this is not true (because it would have been impossible), the fact that the altered scene is depicted in what is otherwise such a realistic way creates a feeling that the defendant *did* view the results of his attack as the viewer is now seeing it – in the altered, moving photographs, in which the victims are visible, underneath and behind solid objects.  Because these are *photographic* renderings, they create the subtle impression that the defendant would have had to be some sort of malevolent paranormal being to see the scene this way.  This false impression bears on the jury's assessment of the moral depravity of the crime, and on the significance of the defendant's expressed or implicit lack of remorse.  As awful as this crime scene was to the observer, it appears even worse in the FARO simulations, and so could substantially prejudice the defendant, especially in the penalty phase.

14

Finally, in contrast to ordinary crime scene photographs, the FARO simulations fully immerse the viewer in the crime scene in a way that dramatizes reality. The juror viewing the simulations ceases to be an outside and impartial observer of events. Rather, the viewer is placed inside Emanuel AME Church in the immediate aftermath of these shootings, amidst the bodies and pools of blood, and seemingly in real time, as if he or she were a first responder. This interferes with the jurors' responsibility (and capacity) "to weigh the credibility of the evidence, to resolve conflicts in the evidence, and—where the evidence supports different, reasonable interpretations—to decide which interpretation to credit." *United States v. McLean*, 715 F.3d 129, 137 (4th Cir. 2013). Moreover, because only the government has access to the scene immediately following a crime, the defense cannot offer a similar, alternative interpretation for the jury to evaluate.

***Misleading Impression.*** The FARO simulations also present a danger of misleading the jury, because – as discussed above – they purport to show the crime scene, but in fact include alterations such as transparent tables and pews, a distorted lighting, and a missing ceiling. These changes go beyond inaccurately depicting the scene; they present a view of the evidence that does not exist, and has never existed, in reality. The danger of misleading and confusing the jury is inarguably high where the prosecution attempts to introduce a digitally altered version of the crime scene. The danger is even higher when that digitally altered version includes views that do not – cannot – even exist in reality. The images presented in the FARO simulations are no more reliable than photo-shopped pictures, which we do not accept in journalism. *See, e.g.,*

https://nppa.org/code_of_ethics.[7]  We should not accept these simulations in a criminal

trial, where the stakes are so high for both the victims' families and the survivors and for

the defendant.[8]  *See supra* at 6 (discussing need for reliability in death penalty trials).

Because of these alterations, the FARO simulations would introduce issues

"tend[ing] to sidetrack the jury into consideration of factual disputes only tangentially

related to the facts at issue in the current case."  *United States v. McVeigh*, 153 F.3d

1166, 1191 (10th Cir. 1998).  Such "sidetracking" is an important concern in the 403

analysis:  "'The notion here is that, in attempting to dispute or explain away the evidence

thus offered, new issues will arise as to the occurrence of the instances and the similarity

of conditions, [and] new witnesses will be needed whose cross examination and

impeachment may lead to further issues.'"  *Id.* (quoting 2 John Henry Wigmore,

Evidence § 443, at 528–29 (James H. Chadbourn rev., 1979)).  The introduction of the

FARO simulations would sidetrack the jury with exactly these sort of questions, because

the defense would be forced to raise the issues of accuracy and susceptibility to

manipulation addressed here.

***Cumulative evidence.***   The FARO simulations are needlessly cumulative, both of

each other and of traditional photographic evidence of the crime scene.  See *United States*

*v. Cunningham*, 694 F.3d 372, 389 (3d Cir. 2012) (Even where evidence is probative,

"the law of diminishing marginal returns still operates.").

---

[7] Much has been written on the ethics of photojournalism.  The proviso in this short ethics guide
– "5.  While photographing subjects do not intentionally contribute to, alter, or seek to alter or
influence events." – is instructive here.
[8] This raises not just evidentiary, but Due Process and Eighth Amendment concerns.

For these reasons, we request that the Court exclude the FARO simulations pursuant to Rule 403, the Due Process Clause, and the Eighth Amendment to the United States Constitution.

### IV.     Evidence of statements allegedly made by the defendant to Carl Stroebel on May 16, 2015, should be excluded as unreliable, unnecessary, and unduly prejudicial.

According to an FBI Report of Interview ("302"), Carl Stroebel, a retired civilian who worked for the Navy as a truck driver and heavy equipment operator and was traveling with his wife in an RV in South Carolina, met a young man in a restaurant on or around May 16, 2015.  The young man showed him a .45 caliber gun that he said he received for his birthday and made inflammatory racist remarks.  In particular, Stroebel told the FBI that the young man said he planned to use the gun to "go hunting."  The young man did not mention any specific plans, however.  Stroebel said he told his wife that night that he felt the young man was a "powder-keg ready to explode."  *See* Exhibit 3 (302 of Carl Stroebel) at 2-4.

The FBI interview took place FBI just days after the shootings.  Stroebel told the agents that he was "certain" the young man was the defendant.  Indeed, he claimed to have recognized the defendant from television footage, in the aftermath of the shootings.  Although the defendant was in custody at the time of the interview (on June 23, 2015), the FBI did not conduct a photo array or lineup to confirm this identification; instead, they showed Stroebel individual photographs of the defendant.  When Stroebel expressed uncertainty when shown the first photograph, the FBI then showed him a second, which

apparently was contained in a three-page driver's record, along with identifying information about the defendant. *See* Exhibit 3 (Stroebel 302) at 2-3.

Recently, when interviewed by a defense investigator, Stroebel stated that he spoke with the young man for only a few minutes and that he was in fact *not* certain that the young man was the defendant. *See* Exhibit 4 (Declaration of Carl Stroebel) at ¶ 11. Other details from Stroebel's interview with the defense also are contradicted or not corroborated by evidence provided in discovery by the government. Of greatest significance, the GPS data we have received does not appear to place Mr. Roof in the location named by Stroebel at the date and time he gave.

Because of the questions about the accuracy of Stroebel's identification, and given the other evidence available to the government to demonstrate substantial planning and premeditation, the Court should exclude the statements Stroebel attributes to the defendant as unreliable and unnecessary under Rule 403. In addition, whatever limited probative value they offer on planning and premeditation is substantially outweighed by their prejudicial nature. Although there will be other unsavory remarks charged to the defendant in this case, the Court should take special care with any, like these, that play on the ugly and painful stereotyping of African-Americans as animals. *See* Ex. 3 at 3-4 (suggesting that Stroebel believed the young man's statement, "I'm going hunting," referred to plans to shoot African-Americans with his new gun). *See also* Phillip Atiba Goff, Jennifer L. Eberhardt, Melissa J. Williams, Matthew Christian Jackson, *Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences*, Journal of Personality and Social Psychology, Vol. 94, No. 2, 292–294

(2008) (describing "shameful history of dehumanizing Black Americans" in the United States).

### V.     The Court should exclude certain statements and should require the government to provide notice of intent to introduce other statements it plans to offer at trial.

The government has advised that it plans to offer "all statements by [our] client" at trial. This form of notice is inadequate as a basis for the defense to file meaningful objections. We understand – and do not object to – the government's intent to offer the Last Rhodesian statement, other internet posts that the government is able to connect to the defendant, and the journal recovered from the defendant's car.[9] There are dozens (if not hundreds) of other statements included in the discovery, however, which the government may choose to offer. Objecting to each potential statement would be a time consuming, yet necessarily shallow, effort.

Some of the statements in this category include:

- by Brock Pack (6/20/2015 FD 302; US017180): This co-worker recalled an unspecified time in 2015 when someone made a racist joke at which time the defendant stated he was a racist;

- by Jacob Meek (6/22/2015 302; US017275): The defendant spoke positively about Hitler four or more times, saying he was disappointed Hitler lost the war because white people lost power as a result;

---

[9] We request, however, that the Court order the government to supplement its Rule 16 disclosure to explain how its experts will connect any internet posts to the defendant. As noted, the current disclosure regarding forensic digital evidence examiners merely describes the process undertaken by the experts, not the results.

- Lindsey Fry (7/7/15 302; US019180): The defendant said that during one of his trips to Charleston he met an unidentified male who offered him a place to stay. The defendant asked Meek to go with him and rob the unidentified male. Meek told the defendant that he did not want to rob the man and that it was a bad idea.

These statements present classic Rule 403 issues. They are – at best – tangential to the charged offenses, which involve the targeting of African-American worshippers at an AME church as victims of violence. They are not well established – the witnesses are unable to specify the dates they were made, nor are there corroborating details to support the assertion that they were made. Insisting on their presentation will render the government's case cumbersome and confusing to jurors. Moreover, the statements reference highly prejudicial information (laudatory statements about Hitler, musing about a potential robbery that is never pursued) which has no place in this trial or any sentencing that may follow.

These examples are a tiny fraction of the statements contained in the voluminous discovery. Nor are we confident that all statements of the defendant have been disclosed, because discovery remains underway (the most recent set of discovery materials having been provided on August 22, 2016). The three referenced statements should be excluded under Federal Rules of Evidence 403 and 404, and the Court should order that the government narrow its list of statements proposed for use at trial to permit the defense to meaningfully make pretrial objections.

**VI.  Under Circuit precedent, lack of remorse evidence is limited to affirmative behavior by the defendant indicating remorselessness, as opposed to failure to demonstrate contrition.**

The aggravating factor, "DYLANN STORM ROOF has demonstrated a lack of remorse," Dkt. No. 164 at 6, must – under Circuit precedent – be established by a showing of the defendant's "affirmative words or conduct."  *United States v. Caro*, 597 F.3d 608, 627 (4th Cir. 2010) (citing cases).  The government has not indicated what its proof of this factor will be, should the case progress to a penalty phase; however, in other cases, the government has resorted to, in addition to affirmative words and conduct, allegations that the defendant, "*has not expressed remorse* for his violent acts."  *Id.* (emphasis in original).  Indeed, in *Caro*, the government took both approaches.

In accord with Circuit precedent, the Court should require that the government limit its presentation to affirmative words or conduct demonstrating lack of remorse.  To assure no missteps, the Court should require the government to give notice, prior to trial, of the evidence it intends to offer in support of this aggravating factor.  *But see U.S. v. Higgs*, 353 F.3d 281, 325 (4th Cir. 2003) (holding that notice of evidence to be presented at the penalty phase is *generally* not required) (emphasis added).

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████  That comment was made, however, in the context of a medical evaluation, in which the defendant's mental state was being probed for suicidal

ideation. According to the notes, the defendant made the statement in the context of denying suicidal ideation. ███████████ had not administered any *Miranda* warning to the defendant, nor advised him – as is customary in a pretrial government psychiatric evaluation – that ███ would not maintain doctor-patient privilege with him.

Under these circumstances, the defendant's statement to a doctor, which reflected both on the offense and (possibly)[10] on his mental condition, should be excluded from trial. Any other result risks dragging the trial into the complicated and time-consuming discussion of the facts surrounding the "suicide watch," which the Court is in the process of hearing now. The risk of wasting time and misleading the jury with this evidence is too high to countenance. *See* Fed. R. Evid. 403; 18 U.S.C. § 3593(c).

This is particularly true given the serious Fifth and Sixth Amendment rights implicated by ██████████████████. *See Estelle v. Smith*, 451 U.S. 454, 462 (1981) ("In this case, the ultimate penalty of death was a potential consequence of what respondent told the examining psychiatrist. Just as the Fifth Amendment prevents a criminal defendant from being made 'the deluded instrument of his own conviction,' it protects him as well from being made the 'deluded instrument' of his own execution.") *Cf. United States v. Dennison*, 937 F.2d 559, 566 (10th Cir. 1996) (holding that because "the prosecutor merely quoted defendant's statements to the jury through his questioning of Dr. Siegal," psychiatrist's notes need not have been disclosed).

---

[10] As the Court learned at the sealed suppression hearing, suicide watch is an onerous condition, and the defendant may have been motivated to say anything to avoid it.

Because of the context in which it was made, the defendant's statement to 

 should not be admitted at trial.[11]

## CONCLUSION

For these reasons, the defendant requests that the Court order the relief discussed above regarding the evidence to be admitted at trial.  In summary:

1.  Authorize additional motions in limine (regarding photographs, digital media, and audio recordings), following the disclosure of exhibit lists in October.

2.  Exclude evidence regarding the Branch AME church, the list of churches seized from the defendant's car, and churches the defendant may have driven near.

3.  Exclude evidence of the FARO-scan simulations.

4.  Exclude evidence of alleged statements made by the person who may or may not be the defendant to Carl Stroebel on May 16, 2015.

5.  Exclude three statements by the defendant under Federal Rule of Evidence 403 or 18 U.S.C. § 3593(c), and order the government to provide notice of statements it intends to introduce at trial.

6.  Limit testimony regarding lack of remorse to affirmative actions or words by the defendant,

---

[11] This is also the case with respect to a June 19th assessment made of the defendant upon his entrance to the Charleston County Detention Center.  *See* Exhibit 6 (Notes of

7. Order the government to provide specific notice under Federal Rule of Evidence 404(b), in response to the defendant's motion for Rule 404(b) notice, Dkt. No. 31.

8. Order the government to supplement its expert disclosures under Federal Rule of Criminal Procedure 16(1)(G), regarding its forensic computer analysts and GPS experts. *See* Dkt. No. 319 ¶¶ 1-4, 12.

Respectfully submitted,

s/ *Sarah S. Gannett*
Sarah S. Gannett
Assistant Federal Public Defender
Federal Public Defender for the District of Arizona
850 W. Adams Street, Suite 201
Phoenix, AZ 85007
602-382-2862
sarah_gannett@fd.org

David I. Bruck
Washington & Lee School of Law
Lexington VA 24450
540-458-8188
bruckd@wlu.edu

Kimberly C. Stevens
Capital Resource Counsel
Assistant Federal Public Defender for the
District of Oregon
1070-1 Tunnel Road, Suite 10-215
Asheville, NC 28805
336-788-3779
kim_stevens@fd.org

Attorneys for Dylann S. Roof