# EXHIBIT 3

# Life, Death and Uncertainty

**To the judge in charge, the murder trial of Kristen Gilbert offered an unsettling lesson — and inescapable conclusion — about the ultimate cost of the death penalty**

July 8, 2001 | Boston Sunday Globe

By Michael A. Ponsor

Federal judges are not allowed to offer opinions, at least not in any significant way, on cases or issues that were, are, or might be before them. That is as it should be.

But an excessive reluctance to say anything about the legal process, even once a case is over, can deprive the public of important information, and produce a suffocating silence about conditions at the front lines of our justice system.

Lawyers do sometimes comment, of course, but they are combatants, foot soldiers, with their own biases and limitations. Legislators and appellate courts make their pronouncements far from the blood and shrapnel of the trenches. Judges are often positioned to see what others cannot, and sometimes what they see is important.

Consider what follows a somewhat mud-spattered dispatch from an advantageous hilltop — the bench — not about who was right or wrong, but about how one particularly fateful campaign for justice unfolded.

The trial was United States v. Kristen Gilbert. Presiding over this, the first death penalty case in Massachusetts in several decades, was the most complicated and stressful thing I've ever done (aside, perhaps, from raising teenagers).

The experience left me with one unavoidable conclusion: that a legal regime relying on the death penalty will inevitably

execute innocent people — not too often, one hopes, but undoubtedly sometimes. Mistakes will be made because it is simply not possible to do something this difficult perfectly, all the time. Any honest proponent of capital punishment must face this fact.

In saying this, I take no position on the death penalty per se. Our Constitution gives Congress the duty to weigh the costs and benefits of particular statutes, and I apply them as enacted. Should another capital case come my way, I will again preside, and perhaps find myself with the duty to order a defendant put to death. I accept this. Nor does my conclusion about the inevitable fallibility of this system mean that I believe the jurors in the Gilbert case erred either in finding the defendant guilty or in declining to impose the death penalty. I have no reason to think they did.

But the issue is not whether the Gilbert jurors got it right, or even whether the next 10, or 20, or 100 capital cases will go off without error. Eventually, in some courtroom somewhere, someone will get it wrong; the process is both too human and too complex to expect otherwise. And for some innocent defendant, that slip will be fatal. For all we know, it may already have happened.

For those in the courtroom who decide the accused's fate — life or death — and there is also a price to pay, but of a different and, of course, far lesser sort.

\*\*\*

Kristen Gilbert, a 30-year-old nurse, was indicted in 1998 for murdering four of her patients and attempting to murder three others by injecting them with the heart stimulant epinephrine. Since she allegedly committed these crimes at a Veterans

Affairs Medical Center, the federal death penalty statute applied. The fact that Massachusetts has no death penalty did not matter.

The method of execution proposed, like the defendant's modus operandi, was lethal injection.

The seven alleged victims were mainly elderly veterans with various ailments, men much loved by their families. The government's theory was never that these were mercy killings; only one of the seven victims appeared to have been in immediate danger, or even in acute distress.

The facts charged were more lurid. Gilbert, the prosecutors said, injected her victims in order to trigger a "code," i.e., a medical emergency at which she could meet a security guard with whom she was having an adulterous affair. She was, in the words of the prosecutor, a "code bug" the way an arsonist is a "fire bug."

If given clear proof beyond all possible doubt that someone committed despicable acts like these, few people would grieve if the murderer happened to be struck by a bolt of lightning, or suddenly died from, say, an undiagnosed heart condition. But trials seldom offer the luxury of absolute proof to a mathematical certainty — and when no smoking gun evidence exists, and when the mechanism for taking life is entirely in human hands, the task for jurors is complicated.

The defense argued that the government could not even prove that the veterans had died of foul play. Gilbert's medical experts — well-respected clinicians with excellent credentials — testified that all seven may very well have suffered unexpected cardiac arrhythmias from perfectly natural or explainable causes. Even with considerable circumstantial

evidence, including Gilbert's own apparently inculpatory statements, but no eyewitness testimony, the trial presented in large part a class battle of experts.

The unpredictability of the courtroom was highlighted by the partial collapse of the government's toxicological case mid-trial. In his opening, the prosecutor promised that the jury would hear a nationally-renowned expert opine that post-mortem examination clearly revealed epinephrine poisoning. Halfway through the trial, he had to admit that on reexamination the results were inconclusive. His renowned expert, it seemed, had made a math error.

In crude summary, those are the pertinent facts of the case. Here is the personal backdrop:

As the trial date approached, a colleague from another court called to caution me about the level of stress I would be facing. He had had his own death penalty trial and had suffered a heart attack shortly afterward. It was a valuable warning.

After 17 years on the bench I do not consider myself particularly squeamish. I have had some tough cases: a drive-by shooting of a 12 year-old boy, a sale of heroin resulting in the customer's death, gang cases, gun cases, drug conspiracies. And although I do not say it with any pride, I have imposed many a horrendous sentence, gone home, eaten dinner, watched the Red Sox, helped with the homework, and slept soundly. You do your best, and you go on the next case.

The Gilbert trial was different. Everyone had to devote a fair amount of attention just to staying healthy and reasonably rested. At a preliminary hearing, I ordered all counsel, only half humorously, to get at least 20 minutes of aerobic exercise four times a week, then followed my own order.

A few days before trial I started having bad dreams, always featuring me either in the role of the executioner or the prisoner facing execution. Time and again, I found myself walking down a hall, breathless with terror at the imminence of death, with the shadows of the guards gliding alongside me. The executioner, a kindly looking, vaguely recognizable man, gazed at me, partly concealing the ax in the folds of his long black robe.

Jurors told reporters afterward that they had had their own nightmares. As the trial progressed, I got used to these dreams, and perhaps the jurors did too. Eventually the dreams ceased being frightening, and then stopped. I never thought I would preside over a death penalty case; most federal judges do not. It is unsettling to experience how quickly the unthinkable can become commonplace, then fade into part of a day's work. You get used to it.

My reaction to the stress became almost embarrassing during jury selection. As potential jurors arrived for individual questioning in small groups, I would instruct them as follows: "You must understand, if the jury were unanimously to find that the death penalty should be imposed upon Ms. Gilbert," and here I nodded in her direction, &lquo;I would be required as the judge to sentence her to death. In other words, I could not change the jury's decision."

The jurors' rapt faces at this point always seemed to reflect their sense of the staggering responsibility they might have. Each time, you could hear a pin drop in the courtroom.

The sheer effort of getting that passage out of my mouth affected me in a startling and ludicrous way. For four or five days, for the first and only time in my life, my grip on the word

"decision" (a rather significant word for a judge) slipped badly. No matter how sturdily I braced myself as I sensed the word approaching, it started toppling out drunkenly as "desisson," "deshishon," or, most often, "deshizzon" — as in "I could not change the jury's deshizzon." It was horrible. But, again, this passed, and by the end of the first week the unspeakable had become speakable — just ordinary words.

Apart from stress, the case presented almost endless logistical challenges, beginning long before trial actually commenced.

For example, a death penalty case requires the appointment of at least two defense attorneys, one of whom is "death qualified," i.e., experienced in at least one prior capital case, and the assembly of a team of necessary defense experts. The shortage of qualified counsel in a state like Massachusetts with no death penalty, and the limitation on the hourly fee that can be paid ($125 per hour, a fraction of what prominent lawyers receive) made this task daunting.

Ultimately, three outstanding lawyers agree, essentially, to abandon the rest of their practices (and to a great extent their personal lives) for about a year to prepare and then try the case.

The experts appointed to assist the defense team included, at various times, three investigators, two toxicologists, a pathologist, two cardiologists, a nursing consultant, a jury consultant, a venue analyst, two mitigation specialists (experts commonly used in capital cases to gather evidence for the penalty phase), a statistician, a neuropsychologist, a behavioral psychologist, a psychiatrist, an endocrinologist, and a paralegal. In the end I was confident that the defendant's team

reasonably balanced the government's, so that the outcome would emerge from the merits, not from imbalance in firepower. To assure this, defense lawyers' fees and experts' costs eventually came to over $1.6 million, all paid from public monies.

In the months before trial, legal and logistical challenges continued to multiply. By my courtroom deputy's count, more than 250 motions were filed before and during the trial, some requiring many hours of hearings. The government took three of my rulings to the Court of Appeals; except for a minor point, I was affirmed.

Some 1,500 jury summonses were sent out, and on Oct. 16, 2000, potential jurors — 800 of them — assembled at Springfield's Symphony Hall (rented because no room in our courthouse was large enough) to hear preliminary instructions and fill out a 15-page questionnaire.

Then, for four weeks, hundreds of jurors came to court for follow-up questions. In the end, 12 jurors and six alternates (two alternates were eventually excused) would sit from Nov. 20, 2000, to March 26, 2001, receiving at first $40, then $50 per day plus 34 cents per mile for travel. The jurors' service was the most unparalleled demonstration of civic responsibility I have ever witnessed. How many of us could, or would, do it?

In the week before the trial, deputy marshals brought in from around the country arrived to assist our local deputies and court security officers. A pressroom and a portion of the courtroom were set aside for the media. (The coverage, while generally balanced and accurate, was intense, particularly in the local media.)

Through the first and larger portion of the trial, the guilt

phase, both the government and defense took advantage of the extensive electronic resources in my courtroom. Video monitors and computer hookups allowed counsel to present evidence via a document presenter, CD-ROM, or a videotape.

This equipment, still rare in most courtrooms, made presentation of medical records, all of which had been electronically scanned, enormously easier. Direct testimony of the government's lead cardiologist unfolded with multicolored, animated diagrams of the heart, a tour de force presentation of expert testimony.

The doctor, who testified for five days, was just one of roughly 70 witnesses. Over 200 exhibits were received into evidence, many of them medical records running to several hundred pages. The jury confronted concepts such as "accelerated ideo-ventricular rhythm," "right bundle branch blockage," and "contraction band necrosis." Unlike many judges, I allowed the jurors to take notes.

Given the technical nature of the testimony, some may have worried that none of the 12 jurors had a four-year college degree, although several had some college and three had worked in a medical area. In my own experience, formal education does not necessarily make for a better juror.

The trial, which began as the leaves were falling, marched on through the end-of-the-year holidays. There were three snow days, four sick days, and three medical emergency days; the defendant and two of the jurors got the flu, and one of the defense lawyers was briefly hospitalized with chest pains.

Then, on Feb. 21, evidence in the guilt phase concluded and the jury began its first-stage deliberations. The 12 days of deliberations were the longest by far I have ever waited

through. Finally, the jury, looking utterly exhausted, returned its verdict: guilty on three counts of first-degree murder, and on several lesser charges.

Now the question was, would the jurors vote to sentence Kristen Gilbert to death? The final, so-called penalty phase of the trial came down to a presentation by the government of aggravating factors and by the defense of mitigating factors. The jury was to weigh these in determining the sentence.

That may sound straightforward, but this portion of the trial was so strange — so unlike any legal proceeding I have ever been a part of — that it is hard to describe.

In a typical criminal trial, including the guilt phase of a capital trial, the rules are clear and strict. But in the penalty phase of a death penalty trial, most of these rules are considerably looser. Both sides are given rather broad latitude to offer evidence about the defendant's background or character, or the nature of the crimes or their impact, that might affect the jury's decision.

What's more, the time-honored "beyond a reasonable doubt" standard does not apply; each juror is to decide whether death is — as the statute puts it — "justified," a term not defined in the statute or, as far as I know, anywhere else. With so few of the usual controls at hand, presiding over the penalty phase of a capital trial, from the judge's point of view, is like chuting the Colorado River on a tea tray.

It did not help that the journey was powered by the force of strong emotion. Probably the most dramatic evidence of an aggravating factor came from family members of the victims. Bravely, and occasionally tearfully, they took the stand one by one to show pictures of their sons, fathers, and brothers, and

to speak, sometimes in language that verged on poetry, of the enormity of their losses.

Never before have I understood so poignantly the devastating impact of a murder. It is hard to lose a loved one, harder to have had no opportunity to prepare for the loss, harder still to know that due to accident or mistake the loss was avoidable. But hardest of all — on a whole other level — is to perceive that the loss came through the deliberate viciousness of another person.

The victim family members delivered their testimony from a witness box no more than 10 or 12 feet from the defendant, passing by her as they walked to the stand almost close enough to touch, under the alert eyes of the deputy marshals.

Probably the most dramatic evidence of a mitigating factor came, in turn, from family members of the defendant. Gilbert's father took the stand, showing pictures of his daughter as an infant, toddler, girl, and young mother. Both the defendant's grandmothers tottered to the stand, recalling cookie baking and quilt making, describing the terrible impact Gilbert's death would have on them. As they spoke, Gilbert, just a few feet way, sobbed. Gilbert's former husband, who had appeared for the government during the guilt phase, submitted a statement now for the defense, expressing his deep concern about the injury his sons would suffer if their mother were executed.

The words of these witnesses were so profound that they almost became "testimony" in a religious sense. How does a judge modulate the impact of these voices fairly, and respectfully, knowing that they may determine whether someone lives or dies? In the end, the jury's decision seemed to emerge from, or at least follow, a kind of loosely supervised

psycho-legal community sharing. But this time the process did not produce unanimity.

After a day and a half, the jurors pronounced themselves deadlocked, and I imposed the only remaining possible sentence, mandatory life imprisonment without possibility of release. This phrase means what it says, by the way. Shortly after the trial, Kristen Gilbert was transferred to a high-security federal facility in Texas to be imprisoned until she dies.

\*\*\*

It might be said that the unusual complexity of the Gilbert case made it more stressful and unwieldy than the ordinary capital proceeding. I do not know. The case had only one defendant, and she was of the same race and economic class, and spoke the same language, as most of the jurors. No headphones for translators.

The circumstances of the murders, while disturbing, were not gruesome or floridly violent in the usual sense. The lawyers on both sides were superb, and I had the enormous resources of the federal court. Unlike state judges, I did not have to confront the possibility of courtroom TV, which is banned in all federal proceedings. Most of all, I was lucky. Logistically, the things that could have gone wrong were countless. Nothing did.

Did the jury get it right? I cannot say. I can say that no jury I have known ever showed more determination to do its job conscientiously.

I have learned to live, at times, with a lack of absolute certainty. A few weeks before the start of the Gilbert trial, a defendant before me swore on the souls of his children that he

was not the dealer who sold the super-pure heroin that killed a young drug user, even though three witnesses said he was. I sentenced him to life in prison without possibility of release.

To do my job, I must make my peace with possible error. Usually, part of this truce with myself comes from knowing that, as long as there is life, the worst of a bad mistake can at least hypothetically, and partially, be corrected.

Perhaps this is what some of the Gilbert jurors thought, too. On the verdict form three said that, while the evidence was strong enough to prove guilt beyond a reasonable doubt, it was too weak to justify the death penalty. As one of the potential jurors said during questioning, "Life is so precious, and death is so permanent."

In 1650, Oliver Cromwell, in a letter to the Church of Scotland, wrote "I beseech you, in the bowels of Christ, think it possible you may be mistaken." Some 300 years later, Judge Learned Hand observed that these words should be engraved over the portal of every courthouse and legislature.

I love our judicial system, and I am proud to serve in it. As I believe this trial demonstrated, no structure of law, anywhere or at any time, has tried so earnestly to protect the rights of those involved in it. But I have a hard time imagining anything as complicated as a capital trial being repeated very often, even by the best system, without an innocent person eventually being executed.

The simple question — not for me as a judge, but for all of us as citizens — is: Is the penalty worth the price?