IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

UNITED STATES OF AMERICA :
:
vs. :
:
DYLANN STORM ROOF : 2:15 - CR - 472

Ex Parte conference in the above matter held Wednesday, November 16, 2016, commencing at 12:30 a.m., before the Hon. Richard M. Gergel, in chambers, United States Courthouse, 83 Meeting St., Charleston, South Carolina, 29401.

APPEARED ON BEHALF OF THE DEFENSE:

DAVID I. BRUCK, ESQ., Washington & Lee School of Law, Lexington, VA.

KIMBERLY C. STEVENS, ESQ., 1070-1 Tunnel Rd., Asheville, NC.

SARAH S. GANNETT, ESQ., 850 W. Adams St., Phoenix, AZ.

REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
Official Court Reporter for the U.S. District Court
P.O. Box 835
Charleston, SC 29402
843/723-2208

THE COURT: Okay. Folks, Mr. Bruck, let me raise a question which I ask as a neutral and not as an advocate, okay, but it's a fair question. Has the defendant's vehement opposition to the mental health defense caused you to reconsider the strategy, in light of your client's unequivocal opposition and apparent intent to disrupt the presentation of such evidence.

MR. BRUCK: No. We don't think -- I mean we do not think that he is -- has the capacity to make that decision rationally. We think his vehement opposition is related to his mental disabilities. And so it's not, you know -- We really do.

THE COURT: Well, one thing I'm going to ask y'all to do, and I need it -- another issue, I'm sure you have a brief sitting right there -- who controls the mental health defense? I've been looking for cases about mitigation in capital cases about who controls it, and I have not found anything directly on point. There's a Law Review article, University of Michigan, but other than that, I can't find any case on point. I certainly -- there are different issues, but I've never -- I certainly -- 2255s where the lawyer deferred to the client, I've seen those cases, but I haven't found one where, in the face of the opposition from the client, the lawyer nonetheless went forward and insisted on that mitigation.

MR. BRUCK: Well, there will be no cases where the

strategy is successful, because there will be no appeal from it. So you're not going to find cases where --

THE COURT: How about cases where later that issue was addressed? I can't find it.

MR. BRUCK: I mean, it's not a plausible postconviction claim that the lawyer should have done nothing, and the client would have been better off.

THE COURT: Well, the client might claim you asserted something contrary to my interests, and it was ineffective assistance of counsel. So I could imagine. It's hard to imagine any issue that hasn't been litigated in capital litigation, but that seems to be one I haven't seen raised.

MR. BRUCK: Well, I should say -- of course we have briefed the issue of who controls which decision, and I think the evidence we place before the Court --

THE COURT: I can't remember, when did that happen?

MR. BRUCK: About a week ago?

MS. GANNETT: The weekend before this past one.

MR. BRUCK: Just before the 7th.

MS. GANNETT: Right after the letter was --

THE COURT: Okay. Then don't worry about briefing that. I'm just concerned, I mean, the client has certain unquestioned authority under the ABA standards. He can change his -- he can do a plea, whatever he wants.

MR. BRUCK: That's right.

THE COURT: He can testify. He can get on the stand and say what's in the letter. Right?

MR. BRUCK: Yes.

THE COURT: He can do that. I would anticipate he would do that. You might differ on that, because of social anxiety, but I think he could well get on the stand and do that, and that would be part of what the jury would hear. He has a right to that. And in the face of that, you know, that's why I raised with you, without trying to advocate one position or the other, that, you know, it's -- have you, you know, even if you have the authority, is it, under these extraordinary circumstances, a good idea?

MR. BRUCK: The alternative is worse. And we are also -- I mean, there's no disentangling this from the client's capacity to stand trial, because we do not think that he is going to simply have the capacity to do the sorts of things you're talking about.

THE COURT: I don't want to get into that, because that's a matter we're going to discuss Monday.

MR. BRUCK: Well, but all I can tell you is as we project further into what is likely to happen in this trial, we don't have reason to believe that the best course would be to give up his only sentencing defense, so no. We are constantly looking at everything. Is the question are we thinking about it? Yes. Is the question have we come to a

different decision? No.

THE COURT: I mean, he says, in Dr. Ballenger's report he says that he would continue his efforts to undermine your effort, your -- he would continue his own activities to undermine your efforts to assert that defense. And he only offers one specific act which concerned me, when he said he would stab you. That's, I'm sure, noted by everybody. This has a way of getting one's attention. But one could only imagine what he might do. Maybe the next letter's to the Post and Courier, you know, who knows. Perish the thought of who he could send it to or what he could say; stand up in the middle of a public hearing and say.

I just, you know, you've previously stated to me that you thought his social anxiety would prevent that. I'm not so sure. I wouldn't go to the bank on that one, Mr. Bruck.

MR. BRUCK: Well, he tells us, I mean, he thinks it will. Now, maybe it won't.

THE COURT: He was -- listen, you watched him interact with me.

MR. BRUCK: That was with a sealed courtroom and --

THE COURT: Back to everybody, but I brought him right there and he interacted with me.

MR. BRUCK: I mean, he says that he doesn't think he can do many of these things with the Government in the room, let alone the public and the victims.

THE COURT: Which raises the question about self-representation, right? He'd be the center of everything.

MR. BRUCK: Yes.

THE COURT: So he'd have to resolve -- I mean, I would have to question him on his willingness to be the center of attention, because that's exactly what he would be.

MR. BRUCK: When he says -- you said, well, what do you want to do at your trial, and he says, nothing, that means more than met the eye. He is saying, as we understand it, and this is from really trying to go down deep with him about this, that he really wants to do nothing. Not that he doesn't want to present any evidence, which he may not, or that he doesn't want to present any argument, he wants to not have to speak. He is afraid. And he doesn't want to do anything. It is as though he wishes he could disappear.

THE COURT: He doesn't want you, on his behalf, to speak.

MR. BRUCK: That's also true. But --

THE COURT: And, you know, you chalk it up to one reason, and Dr. Ballenger offers, in the report, another alternative explanation, and we need to explore all that. That's part of this hearing. I'm going to invite him to speak at his competency hearing, it's his right to speak and not to speak, and I will advise him of that. I'm sure you will also advise it's his constitutional right to do that. And he can

do it without waiving his right against self-incrimination. So he, you know, I will let him do it, we have had obviously the benefit of this prior encounter in which, frankly, some of these same issues were discussed that would overlap here.

Now, and that moves us to the next issue, Mr. Bruck, is I have just got to address this issue of what he wants to do regarding his plea status. Because he has said to us on the record that he wanted to plead guilty. I wasn't going to pursue it right then. I told you the other day that I was going to give you a chance to counsel him. But if I determine he's competent, that's the next issue I just have got to address this issue with him. And if he says no, I'm happy with my plea status, that's fine. But if he says to me, no, I want to plead guilty, that's exactly what I want to do, yeah, I've talked to my lawyer and that's exactly what I want to do, well, obviously that's not how you take a plea, right? I mean, there's a very elaborate process I have to go through, and it would be particularly in a case with 33 counts, right? But I would have to do that. And so my intention is to do that, if I determine that he's competent, that will be -- I will send the Government out of the room, and I will then address that with him. Okay? So you need --

MR. BRUCK: Yes. We have been aware of that and we have been acting accordingly.

THE COURT: And I'm going to confirm with him that he

has talked to y'all, that he has been told the up side and down side of his options, and that he has thoroughly considered them, and that it's entirely his decision, and then he'll let us know, okay?

MR. BRUCK: Yes.

MS. STEVENS: Your Honor, we have advised him of that, and it's our opinion right now that he might need time, after this hearing, to calm down a bit before he is questioned on other substantive issues. He is quite worked up at the moment.

THE COURT: Well, I understand that, and let me evaluate that when I talk to him, okay?

MS. STEVENS: Yes, sir.

THE COURT: And one of the things I'm -- if he says to me, I need some time to think about it, I'm all for that. Okay? But here is my concern. In the first arraignment, at the arraignment, Mr. Bruck said he wanted to plead guilty. I never noticed, I never saw the transcript, I wasn't aware of that, it just -- something I wasn't aware of. I read it recently. So then I asked him about it. And he said to me, when it came to my attention, yes, I want to plead guilty, and he misstated the standard. He said my lawyer -- forget whether the lawyer told him or not, that was his understanding of his options. He needs to be aware what his options are, and that he needs to make an informed, knowing, intelligent

decision. And I just think that's an important part. And, you know, we've questioned whether the mitigation defense is a fundamental or strategic call; there is no question the plea is a fundamental right.

MS. STEVENS: Correct.

MR. BRUCK: We have covered that, and at the end of our last conversation about it, his position was not the one that he expressed about wishing to plead guilty. Now, that, for reasons that are about to be gone into, who knows what it's going to be next week, but I did want you to know that we were mindful of the Court's request to clarify things with him.

THE COURT: And again, that's one of those things I am a complete neutral, I don't have any dog in this, I've just got to get it clarified.

Finally, I am concerned about security issues, and specifically security issues regarding y'all with your client. Okay? He's told us things and then he does things after he tells us. So let us be forewarned. I'm going to keep him in leg irons and handcuffs during the competency hearing. I'm not going to -- I've talked to my marshals; they are concerned.

I've got to tell you, Mr. Bruck, we mostly keep our criminal defendants restrained in things not in front of the jury. That is very common for us. In fact, the fact that he

was not restrained the other day was unusual in our practice.

So I think that's a prudent thing to do. I've got to -- my marshals feel it's prudent. Also, at the end of our meeting I'm going to have one of our marshals come up and chat with y'all about security at your table, about what you have out and available. That would be a no no, right? (indicating) You may have had that discussion before in y'all's experiences. I've had a couple defense lawyers having to be given this discussion.

MR. BRUCK: I have to say that I appreciate everything the Court has said, I certainly understand the marshal's perspective. We are not afraid of our client physically, period, no matter what he says. It is not a real issue. It is -- and, you know, I hope -- I understand that the Court is going to be conservative in making judgments about this or being cautious, but we really hope that we can assume whatever risk there is, because we think it is nonexistent. He is trying to get attention. He's like --

THE COURT: Well, it worked. It worked. And he's not trying to get attention for attention's sake, Mr. Bruck, in every fiber of his body he opposes your defense. Now, whether that's prudent or wise or good or in his interest or not in his interests, I'm not commenting. I'm just telling you that he's exercising the limited options he has to overturn what he believes is a wrong decision on your part.

And he doesn't have a lot of options. And among those options is to disrupt the Court proceeding in some way or to assault his lawyer. And I frankly, as much as you have a confidence in him, you would not have predicted some of his behavior so far, and I'm telling you he -- I'm going to assume when he tells me something, that it's true.

MR. BRUCK: Something else I should say, for what it's worth, is that he has narrowed this threat, such as it is, I don't take it seriously for anybody, but he has made absolutely clear that he would never try to stab girls, which is -- by which he means all the lawyers in the case except for me.

THE COURT: That's not that much of a comfort for me. I'm glad that he has taken that view. But, Mr. Bruck, let's just be realistic. This is a man who stands accused of walking into a church and killing nine people. And he told people before he did it, that's what he was going to do. That's alleged. Okay? So when he tells a psychiatrist that he's going to stab you, I'm going to kind of assume that that's not hyperbole, though most of the time it would be hyperbole, and it hopefully is hyperbole.

MS. STEVENS: Your Honor, in the last hearing I did hand Mr. Roof a pen. I did ask the marshal permission first. He had his legal papers on the table.

THE COURT: By the way, they will not grant the

permission this time.

MS. STEVENS: And I just wanted the Court to know that I did signal them and say is this okay, we gave him a pen.

THE COURT: We did not have that concern before.

MS. STEVENS: Right. Nor did we at that time.

MR. BRUCK: All I can say --

THE COURT: And we do have ways to give little pencils, we have ways in which they can have writing implements that are not weapons, potential weapons.

MS. STEVENS: He really was actively looking at his papers and making notes before the Court brought him up there, so --

THE COURT: I'm fine. And listen, we would continue, we just are going to not be a potential weapon, right? And you're going to receive instructions about where y'all leave your pens and where you put things that could be a potential weapon. And just be cautious, there's no harm in it. The harm is if he actually acts out.

MR. BRUCK: Well, we've told you how we feel; I appreciate the Court's concern.

THE COURT: Okay. Any other matters y'all need to address with me now?

MR. BRUCK: No, sir.

THE COURT: Okay. Well, I will enter some orders

today that will kind of keep all these deadlines straight for everybody, and we will see you on Monday.

MR. BRUCK: Very well. Thank you.

(Conference concluded at 12:47 p.m.)

REPORTER'S CERTIFICATION

I, Debra L. Potocki, RMR, RDR, CRR, Official Court Reporter for the United States District Court for the District of South Carolina, hereby certify that the foregoing is a true and correct transcript of the stenographically recorded above proceedings.

S/Debra L. Potocki

______________________________

Debra L. Potocki, RMR, RDR, CRR