IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| DYLANN STORM ROOF | ) | |

**MOTION FOR APPROPRIATE REMEDIAL MEASURES
TO PROTECT THE FAIRNESS OF TRIAL**

   The defendant, through counsel, hereby moves that the Court take measures to ensure the fairness of the defendant's trial and sentencing following events that occurred during the testimony of the government's first witness on December 7, 2016, and thereafter during argument on the defendant's ensuing motion for mistrial in open court on the morning of December 8. These events include:

1. The Court's validation, in the presence of numerous prospective victim-witnesses, of the first witness's statement that the defendant "just sat there the whole time evil. Evil. Evil as could be," and of her ensuing statement on cross-examination that "[h]e's evil. There's no place on Earth for him except the pit of Hell."

2. The Court's assertion, also made in open Court in the presence of large numbers of government witnesses who have yet to testify, that defense counsel's brief cross-examination of the same witness regarding the

1

      defendant's statements at the scene of the crime had been designed for the deliberate purpose of provoking a mistrial; and

3. The lead prosecutor's statement that Hell "is where [the defendant]'s going if he dies of natural causes or if the state does it", which gave the impression that the United States government agreed that the defendant should be consigned to Hell.

These statements, separately and in combination, have created a constitutionally-impermissible risk of tainting the future testimony of the large number of unsequestered prospective witnesses who heard them in the courtroom, and have undermined the defendant's right to be effectively assisted by counsel. Corrective action is therefore required. Absent such measures, neither the defendant nor the public can have confidence that this trial will produce a just result.

## FACTUAL BACKGROUND

      Testifying as the prosecution's first witness on December 7, Ms. Felicia Sanders demonstrated the same warmth, strength and leadership that have encouraged and uplifted the nation since the events that gave rise to this prosecution. To a rapt courtroom audience that smiled, laughed and frequently wept as she spoke, Ms. Sanders described her own life and the lives of the other victims and survivors, their roles at the Emanuel AME Church, and the values that guided their daily lives. Although her grief and suffering were almost palpable as she testified, the love that inspired Ms. Sanders's testimony enveloped the courtroom. Remarkable, but not surprising, because Ms. Sanders has consistently demonstrated her generous spirit, and has turned her grief to

2

positive public purpose.  *E.g.*  https://www.youtube.com/watch?v=MxK-Q191tDU (addressing 2016 Democratic National Convention to denounce hate and support gun control), https://www.youtube.com/watch?v=8hQtRrBS  (leading unity march for racial reconciliation in Ft. Wayne, Indiana).

It thus came as a surprise to the defense when, toward the end of her testimony, she made these statements: "It was a lot of shots. Seventy-seven shots. In that room. From someone who we thought was there before the Lord, but in return, he just sat there the whole time evil. Evil. Evil as can be." She broke down and a recess was declared just two questions later. Before the jury returned to the courtroom, but with the witness still on the stand, defense counsel interposed an objection to her characterization of the defendant as "evil," and also to her earlier testimony that "the defendant over there with his head hang down, *refusing to look at me right now*, told my son 'I have to do this.'" The Court overruled both objections, and also stated that "there was nothing improper" about the witness's description of the defendant in the courtroom. Moments later, after the jury returned, Ms. Sanders responded to a brief cross-examination about the defendant's suicidal statements by declaring that "[h]e's evil. There's no place on Earth for him except the pit of Hell."

The following morning, the defense filed a motion for mistrial based on what had transpired at the end of Ms. Sanders' testimony. (Dkt. No. 777). During argument on the motion in open court,[1] the Court again validated the witness's characterization of the

---

[1] We attach here an article and a reporter's "tweet" describing the high emotion in the courtroom that day. *See* Exhibit 1.

defendant as "evil," stating that the testimony was "a clear comment on what she had just observed. Not a comment on his -- him as a person," and that it was "relevant to malice, it's relevant to a hate crime, it is relevant to the -- she makes a reference of being in the house of God, she -- it's relevant to the obstruction of religion." After some further remarks by the prosecutor, the Court went on to discuss the witness's statements on cross-examination to the effect that "there's no place on Earth for him except the pit of Hell":

- "I have the impression when [defense counsel questioned the witness], he was trying to produce a mistrial and I anticipated it this morning."

- "It looked that way [like defense counsel was trying to produce a mistrial] to me."

- "You [defense counsel] saw me looking at you, I looked at you when you did that. You know that. And because I just couldn't believe you were persisting in that."

- "I thought I'm going to see a mistrial motion. And I came in this morning and my clerks told me and I smiled because I saw it coming."

- "It's just kind of funny because you elicited it."

When defense counsel attempted to explain the purpose of his questioning, which was simply to elicit a single statement by the defendant that the witness had conveyed to law enforcement (and its logical significance to material issues in the case), the Court repeatedly rejected counsel's explanation, asserted counsel had an ulterior motive, and characterized his questioning as "irrelevant" to the guilt phase of the trial. The Court admonished, "You wanted to get in that he was planning to commit suicide. That's not

4

an element of the crime, it's not a defense to the crime, the 33 counts he has. It's not relevant."[2]

In the course of this discussion, lead counsel for the government also appeared to personally endorse the portion of the witness's testimony in which she had consigned the defendant to Hell. Disputing defense counsel's assertion that jurors might infer from the witness's testimony that she was advocating that the jury should impose the death penalty, the prosecutor said:

> And she [the witness] was not commenting on the punishment is [sic] what she was describing is if he kills himself, where he was going. That *is* also where he's going if he dies a natural causes or the state does it.[3]

This statement by the prosecutor elicited audible murmurs of assent and some laughter from the gallery. The Court responded, "Yeah, you know, I just – I think I frankly number one, I agree with you on all that . . . ."

## ARGUMENT

Throughout our representation, we have tried to fulfill our responsibilities to our client with sensitivity to the needs of the survivors and victims' family members. Out of

---

[2] We believe this misstates the law, for reasons addressed in Dkt. No. 783. In short, no single piece of evidence need constitute a full defense to the crime, and defense counsel was entitled to elicit the defendant's comments at the scene of the crime from the percipient witness. Moreover, where, as here, government chooses to prove up alleged aggravating sentencing factors at the guilt phase (such as "substantial planning and premeditation" and lack of remorse), no rule of law bars the defendant from mounting a timely response before the government's sentencing allegations, unrebutted, harden into unassailable truths in the minds of the jurors.

[3] Although less clear from the transcript, it appeared to courtroom observers that the prosecutor was expressing his own opinion, rather than characterizing the opinion of the witness. *See* Exhibit 2 (Tweet from WIS-TV reporter Chad K. Mills) ("Richardson, yelling passionately, says it's a matter of fact that #DylannRoof is going to Hell.").

appreciation of the grievous harm they have experienced, the resilience and leadership they have demonstrated, and the importance of this trial in their lives, defense counsel have supported their right to be present in the courtroom to the greatest extent practicable.[4] In extending this support, however, we did not foresee that the Court would both endorse inflammatory testimony and accuse the defense of acting in bad faith before a courtroom audience largely composed of victim-witnesses who may testify over the next few days and weeks. In its comments on December 8, the Court conveyed to these witnesses – and the public – that the defense was manipulatively attempting to trick an eyewitness to the crime (and the grieving mother of a murder victim) into giving "irrelevant" evidence for the purpose of provoking a mistrial.

We also failed to anticipate comments that could be construed as the lead prosecutor's prediction – proclaimed before the same audience – that the defendant would go to Hell upon his death. It is hard to imagine comments – whether intended to be interpreted in this manner or not – less consistent with the prosecution's supposed role in ensuring fair and impartial administration of justice for all Americans.[5]

---

[4] While federal law permits crime victims and family members to attend trials, it also includes exceptions. *See, e.g.*, 18 U.S.C. § 3771(a) (noting exception when court "determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding").

[5] *See* https://www.justice.gov/about. We appreciate that the indictment charges obstruction of religious exercise under 18 U.S.C. § 247, but the apparent consignment of a criminal defendant to Hell by a federal government official nevertheless violates the Establishment Clause of the First Amendment.

6

Just days before the start of the trial of Timothy McVeigh on April 24, 1997, Congress enacted the Victim Rights Clarification Act of 1997, which in pertinent part provides as follows:

> Notwithstanding any statute, rule, or other provision of law, a United States district court shall not order any victim of an offense excluded from the trial of a defendant accused of that offense because such victim may, during the sentencing hearing, testify as to the effect of the offense on the victim and the victim's family or as to any other factor for which notice is required under section 3593(a).

This statute, now codified as 18 U.S.C. § 3510(b), was passed in direct response to two rulings by the trial judge in the McVeigh case that would have excluded victim-witnesses from attending the trial under Federal Rule of Evidence 615. Jo Thomas, "New Law Forces a Reversal in Oklahoma Bombing Case," NEW YORK TIMES (March 26, 1997). The Act's legislative history reveals that Congress carefully considered a number of potential sources of prejudice before deciding that victim-witnesses should be able to observe all trial proceedings. H.R. REP. 105-28, H.R. Rep. No. 28, 105TH Cong., 1ST Sess. 1997, 1997 WL 120144, 1997 U.S.C.C.A.N. 15. But in providing full access to the courtroom to victim-witnesses in capital as well as non-capital trials, Congress surely anticipated that the witnesses would be attending judicial proceedings – such as those that Judge Matsch was already conducting in *McVeigh* – at which non-responsive answers and prejudicial characterizations of the accused would be firmly discouraged rather than validated.

In contrast, the events of last Thursday morning have placed the Court's and the government's approval on a type of witness testimony that should never be permitted in a

7

court of law. They have also encouraged future witnesses to replicate such testimony, and to treat cross-examination by defense counsel as a dishonest and cynical exercise in manipulation. In combination, the Court's and the prosecutor's remarks have created the conditions for what could become a cascade of inflammatory and improper testimony from grieving survivors and family members. The statements of the Court and of the government's chief representative at the trial create an unacceptable risk of violating the defendant's rights under Fifth, Sixth, and Eighth Amendments to the Constitution, and require strong remedial measures.

**Disparagement of defense counsel.** The Court has an obligation to promote public confidence in the integrity and impartiality of the proceedings. "[T]he function of counsel is almost as important as that of the judge, therefore, counsel is entitled to courtesy and respect." *Zebouni v. United States*, 226 F.2d 826, 827 (5th Cir. 1955). It is well understood that the Court should not disparage defense counsel in front of the jury. *See United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir. 1987), *overruled on other grounds by United States v. Watson,* 866 F.2d 381, 385 n. 3 (11th Cir.1989). The same principle should apply when the Court disparages defense counsel and the defense in front of a gallery full of unsequestered witnesses.[6]

If this were just a matter of disparaging counsel, the issue would be simpler. But here, the Court has disparaged our entire approach to the trial – accusing us of attempting

---

[6] We note that fully one-half of the courtroom is reserved for survivors and victim family members and that every seat was taken for the first two days of trial. Many of those seated in the gallery are identified on the government's witness list.

8

to derail the case by manipulating a particularly well-respected and admired witness (for whom defense counsel actually have the utmost respect) at a public moment of great vulnerability.[7] This accusation, which has yet to be withdrawn, undermines our ability to defend our client because it makes if difficult or impossible to cross-examine other, similar witnesses with running an undue risk of provoking more inflammatory characterizations of our client and volunteered interjections about what should be done to him.

What occurred on December 8 also needlessly strained the already-fraught relationship between defense counsel and our client. The defendant learned during the argument on the motion for mistrial that although the Court felt constrained to announce that it "*still* ha[s] a great respect for [Mr. Bruck]", it also believed him to be either manipulative or incompetent ("And you saw me looking at you, I looked at you when you did that. You know that. And because I just couldn't believe you were persisting in that."). Either way, the defense is now – as we did in the courtroom during argument on the mistrial motion – compelled to defend itself as well as its client. This raises new and serious questions about our representation. *See* American Bar Ass'n, Model R. Prof'l Conduct 1.7(a)(2).[8]

---

[7] From the tone in the courtroom during the proceeding, it was evident that – setting aside any disagreements on the legal issues – few shared our view of the gravity of our motion for mistrial. During the colloquy between the Court and counsel, the gallery responded to jokes by the Court and the prosecutor with laughter, and to disparagement of counsel with audible approval. *See* Exhibit 3.

[8] To be sure, absorbing criticism is part of the job description of criminal defense attorneys. *See e.g., State v. Truesdale,* 296 S.E. 2d 528, 531-32 (S.C. 1982) (castigating lead defense counsel for making an unenforceable, "bizarre," and "improper" motion to prohibit a prosecutor from

9

**Validation of improper and prejudicial witness testimony.**  At the same time, both the Court and the government have now placed their seeming imprimatur on a witness's characterization of the defendant as evil and deserving to die and go to Hell. That seal of approval was given before a large number of witnesses whose testimony will likely dominate the penalty phase of the trial, and possibly the close of the guilt phase as well.  Blame for this was – we believe unfairly – affixed squarely on the defense team. Each of these was error.  In combination, they will prevent a fair trial absent prompt and strong remedial action.

## RELIEF REQUESTED

For the foregoing reasons, the defense requests that the Court provide the following relief:

1. Reconsider and withdraw its prior approval of victim-witness testimony about the defendant's "evil" nature, and about the witness's conviction that "there's no place on Earth for him except the pit of Hell."

2. Instruct the jury that any such witness testimony regarding the defendant, or witnesses' opinions on the sentence he should receive, are improper, have been stricken from the evidence, and should be accorded no weight in the jury's determination of the defendant's guilt or punishment.

---

striking African-American jurors on the basis of their race, less than four years before *Batson v. Kentucky,* 476 U.S. 79 (1986)).   But when such disparagement threatens to undermine our ability to conduct our client's defense by encouraging nonresponsive or unfairly prejudicial responses to counsel's questions on cross-examination, and by further straining the attorney-client relationship, our obligation to our client requires us to seek a remedy.

3. Publicly withdraw the Court's prior accusation that defense counsel deliberately elicited testimony from any witness for the purpose of provoking a mistrial;

4. Instruct all potential government witnesses that, any prior rulings to the contrary, trial witnesses must answer only the questions put to them, and must refrain from expressing or volunteering opinions about the defendant or the punishment the witness thinks the jury should impose; and

5. Direct the government

    a. To refrain from any further comments implying (or that are reasonably likely to be understood as implying) that the government believes that the defendant will go to Hell when he dies,

    b. To advise each prospective government witness against expressing opinions about the defendant or his punishment,

    c. To refrain from referring to "evil" or "the pit of Hell" or similar terms of opprobrium in closing argument.

## CONCLUSION

The defendant requests that the Court grant the relief requested above, along with such other relief as may appear just under the circumstances.

Respectfully submitted,

*s/ David I. Bruck*
David I. Bruck
Washington & Lee School of Law
Lexington VA 24450
540-458-8188

bruckd@wlu.edu

Sarah S. Gannett
Assistant Federal Public Defender
Federal Public Defender for the District of Arizona
850 W. Adams Street, Suite 201
Phoenix, AZ 85007
602-382-2862
sarah_gannett@fd.org

Kimberly C. Stevens
Capital Resource Counsel
Assistant Federal Public Defender for the
District of Oregon
1070-1 Tunnel Road, Suite 10-215
Asheville, NC 28805
336-788-3779
kim_stevens@fd.org

Emily C. Paavola
900 Elmwood Ave., Suite 200
Columbia, SC 29201
803-765-1044
Emily@justice360sc.org

Attorneys for Dylann S. Roof