# EXHIBIT 5

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )  )  v.     )  )  DYLANN STORM ROOF      ) | CASE NO.: 2:15-CR-472 |

**PROFFERED TESTIMONY OF DONNA SCHWARTZ-MADDOX**

Dr. Maddox would testify concerning her qualifications and expertise as a forensic psychiatrist licensed to practice medicine in South Carolina. She has been qualified as an expert in numerous courts, both state and federal and has testified in approximately 300 criminal cases, including approximately 29 capital cases. She has been retained by the prosecution, the defense, and appointed by the courts to perform evaluations.

Dr. Maddox has met with Mr. Roof on nine occasions: (1) April 22, 2016; (2) April 30, 2016; (3) June 4, 2016; (4) June 19, 2016; (5) July 23, 2016; (6) August 20, 2016; (7) August 31, 2016; (8) November 8, 2016; and, (9) November 15, 2016. These meetings total approximately 25 hours with Dylann Roof.

Dr. Maddox also interviewed members of Mr. Roof's family, including his mother, Amy Cowles Roof; his paternal grandparents, Joe and Lucy Roof; and his father, Benn Roof. She toured Amy Roof's home and Dylann Roof's bedroom in the home.

Dr. Maddox reviewed social history records provided by the defense, including birth records, medical records and Lexington County mental health records. She also reviewed portions of discovery provided by the government, including Mr. Roof's videotaped interview by the FBI and the text posted on the Last Rhodesian website.

On the basis of all of this information, her education, training and professional experience, Dr. Maddox has diagnosed Mr. Roof as follows:

    a.    Autistic Spectrum Disorder, requiring support, without accompanying intellectual impairment, and without accompanying language impairment;

  b. Other Specified Schizophrenia Spectrum and Other Psychotic Disorder;

  c. Other Specified Anxiety Disorder.

Each of these diagnoses impacted Mr. Roof in the time period leading up to the crimes, during the crimes, and in the time period since.

  Dr. Maddox would testify that these diagnoses are supported by:

  a. Mr. Roof's developmental history, including pediatric records, school history, history from parents, and social history.

  b. Mr. Roof's school history, including his attendance at many schools, his increasing social anxiety, his lack of social relationships, his body dysmorphic concerns and other problems that by the 8th or 9th grade caused him to avoid school despite above average intelligence, and led him to drop out of school and eventually obtain his GED.

  c. Mr. Roof's vocational history, which was unsuccessful. He had an aversion to chemicals and social anxiety. He dressed oddly with just one example being that he would often wear two layers of clothing and his t-shirts cutoff.

  d. Mr. Roof's medical history, which included a declining head circumference not matching height/weight of concern as early as age 18 months. He was tongue-tied as a child until corrective surgery. His yearly wellness checks, particularly as he reached the 8th and 9th grades, reflected that he spent all his time isolated and on his computer. He had social anxiety and developed concerns about medical problems. He became concerned that he had cancer of the lymph node, after learning of his mother's boyfriend's history of that disease. When doctors reported minimal or no abnormalities requiring treatment, Mr. Roof became preoccupied with Hashimoto's disease and his somatic preoccupations that at times are delusional.

  e. Mr. Roof's family medical history, which includes translocated chromosomes in both Mr. Roof and his mother. Mr. Roof's first cousin has an autism spectrum disorder. His mother has an anxiety disorder and a number of members of her family suffer from mood disorders.

  f. Mr. Roof's substance abuse history. He was experimenting with drugs trying to "feel good" and incurred a legal charge, which should have prohibited his lawful purchase of a handgun.

      g.      Mr. Roof's prior legal history, which included police interactions due to drugs, avoidance of school, and odd behaviors and interactions at a mall when he was in search of a job.

      h.      Mr. Roof's psychiatric history, which included evaluation in 2009 at a mental health center in Lexington County. Evaluators noted social anxiety and withdrawal, but Mr. Roof did not follow through with recommended treatment.

      Dr. Maddox would address the time-frame covered in the government's time-line described by Agent Hamski, which began in August 2013 with downloaded racist material and extends to the date of the crimes. By August 2013, Mr. Roof was socially isolated and had an identity confusion. He was not progressing or developing like his peers. Where others his age might be headed to college or have a job, Mr. Roof was essentially in limbo. His autism spectrum disorder impaired his ability to understand the world around him. He looked to the internet for answers to virtually every question he had whether they be sexual, medical, political, or about world events. His learning and searching were not guided by anyone. When he tried to talk to his mother or anyone else about his developing ideas (learned from racist internet sites) about race, his fears that blacks were killing whites, and that the Jewish media were covering it up, his ideas offended others so he felt constrained to keep them to himself. When others with autism spectrum disorder have socially inappropriate ideas, they can learn through therapy and appropriate interactions what the "limits" are and what is appropriate. Mr. Roof did not have that. With its display of violent images, purported statistics and white supremacist ideology, the internet taught him hate, mostly race-based, and he had nobody to dispel those ideas.

      At the same time, his psychosis was developing. He became increasingly controlled by fear, both in his racist beliefs (about blacks killing whites and the media coverup) and about his own health and wellbeing.

      Dr. Maddox would explain that her diagnosis is also supported by her own observations of Mr. Roof, most of which are reflected in the confession video, including the following:

1. Mr. Roof shows deficits in eye contact and frequently looks down or someplace other than at the speaker.

2. Mr. Roof's manner of speaking is frequently pedantic.

3. Mr. Roof's thought processes become disorganized. That is, if conversation is not guided by the other participant, he frequently

       presents topics in a manner such that one topic is not related to the other. He jumps from one topic to another with no apparent connection between the two.

4. Mr. Roof's affect is often incongruent. For example, he may smile inappropriately for no apparent reason or when discussing topics that upset him. He also may smile when he is upset with the interviewer. He may smile at times that are very inappropriate to the content of the subject matter being viewed or discussed. When his affect is not inappropriate, it is constricted.

5. Mr. Roof's thought content at times reflects grandiosity, paranoia, fixation on narrow focused interests, and difficulty understanding others' emotions and reactions to his behaviors. He is preoccupied with his physical health, potential illnesses, potential treatments and his long-term health.

6. He is sometimes childlike in demeanor.

7. He has consistently lacked insight.

8. Among Mr. Roof's most prominent thought content is paranoia and suspiciousness. Among his most persistent fears, which are reflected to some degree in the confession video:

    a. He is preoccupied with the idea that white people are under attack.
    b. He is preoccupied with his belief that the world is not safe.

Dr. Maddox would testify that Mr. Roof's behavior and statements during her evaluation are consistent with his prior records, reports from others, and the crimes and aftermath.

                        Respectfully submitted,

                        s/ *Sarah S. Gannett*
                        Sarah S. Gannett
                        Assistant Federal Public Defender
                        Federal Public Defender for the District of Arizona
                        850 W. Adams Street, Suite 201
                        Phoenix, AZ 85007
                        602-382-2862
                        sarah_gannett@fd.org

David I. Bruck
Washington & Lee School of Law
Lexington VA 24450
540-458-8188
bruckd@wlu.edu

Kimberly C. Stevens
Capital Resource Counsel
Assistant Federal Public Defender for the
District of Oregon
1070-1 Tunnel Road, Suite 10-215
Asheville, NC 28805
336-788-3779
kim_stevens@fd.org

Emily C. Paavola
900 Elmwood Ave., Suite 200
Columbia, SC 29201
803-765-1044
Emily@justice360sc.org

Attorneys for Dylann S. Roof

5